No. 21,485.

THE KANSAS CITY, KAW VALLEY & WESTERN RAILWAY COMPANY, *Plaintiff*, v. J. L. BRISTOW et al., as THE PUBLIC UTILITIES COMMISSION, etc., *Defendants*.

SYLLABUS BY THE COURT.

1. PUBLIC UTILITY—*Right of Railway Company to Issue Bonds and Stock —Discretion of Utilities Commission.* Under the provisions of section 8353 of the General Statutes of 1915, a public utility has the right to issue whatever bonds and stock may be necessary to carry out corporate powers, acquire property, construct and extend facilities, and maintain and improve service, and the public utilities commission has no general discretion to refuse to certify such securities.

2. PUBLIC UTILITY—*Application for Certificate Validating Bond Issue— Power of Utilities Commission.* The public utilities commission has full power to ascertain the truth of all statements made by a public utility in its application for a certificate validating a bond and stock issue, including the required statement that the capital stock to be secured is necessary for a specified statutory purpose and will be used therefor.

3. SAME—*Issuance of Bonds—"Necessary" Defined.* The word "necessary" as used in the statute means needful under all the conditions attending the enterprise.

4. SAME—*Issuance of Bonds—Utilities Commission May Require Proof of Necessity.* The public utilities commission has authority to require proof of need for the issuance of bonds and stock beyond the proof afforded by the verified application.

5. SAME—*Issuance of Bonds—Writ of Mandamus Denied.* Under the facts stated in the opinion the public utilities commission did not arbitrarily refuse to certify an issue of bonds and stock.

Original proceeding in mandamus. Opinion filed October 6, 1917. Writ denied.

*John S. Dean,* of Topeka, for the plaintiff.

*H. O. Caster,* and *Fred S. Jackson,* both of Topeka, for the defendant.

The opinion of the court was delivered by

BURCH, J.: The action is one to require the public utilities commission to issue a certificate validating a proposed bond and stock issue of the railway company, which certificate it is alleged the commission arbitrarily withholds.

The railway company was organized to construct and operate an interurban railway from the city of Kansas City, Kan., to the city of Topeka. A construction company was organized to build the road. The stockholders of the two companies were substantially, but not wholly, identical. The two companies entered into a contract whereby the construction company agreed to construct the road for $50,000 per mile in bonds and stock of the railway company as follows: first-mortgage bonds, $20,000 per mile; second-mortgage bonds, $12,500 per mile; common stock, $17,500 per mile. The plan of construction contemplated completing the road in three successive sections; the first from Kansas City to Bonner Springs, approximately sixteen miles; the second from Bonner Springs to Lawrence, approximately twenty-three miles; the third from Lawrence to Topeka, approximately twenty-six miles—a total distance of approximately sixty-five miles. When the first section was completed the railway company made application to the commission to certify a bond and stock issue to pay for the construction of the entire road, and such a certificate was issued. Bonds and stock for the first section were to be delivered at once, and for the second and third sections on completion of those sections. While the certificate did not in terms state that the bond and stock issue was certified on the basis of $50,000 per mile, such was the basis of the issue, and the authorized securities apparently fulfilled the contract for construction. When the second section of the road was completed the securities authorized for that section were delivered to the construction company. Some turnouts not included in the original estimate of distances were necessary, a slight change of route was required, and the result was there were 42.314 miles of track between Kansas City and Lawrence instead of 39 miles as originally estimated. The application now under consideration was for a bond and stock issue at the rate of $50,000 per mile for the excess distance.

The statute defining the rights of the railway company and the power of the public utilities commission reads as follows:

"A public utility or common carrier may issue stocks, certificates, bonds, notes or other evidences of indebtedness, payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property, for the purpose of carrying out its corporate powers, the construction, completion, extension or improvements of its

facilities, or for the improvements or maintenance of its service, or for the discharge or lawful refunding of its obligations, or for such other purposes as may be authorized by law; provided, and not otherwise, that there shall have been secured from the commission a certificate stating the amount, character, purposes and terms on which such stocks, certificates, bonds, notes or other evidences of indebtedness are proposed to be issued, as set out in the application for such certificate, and that the statements contained in such application have been ascertained to be true, but this provision shall not apply to any lawful issue of stock, the lawful execution and delivery of any mortgage, or to the lawful issue of any bonds thereunder which shall have been duly approved by the board of railroad commissioners prior to the taking effect of this act. The proceedings for obtaining such certificate from the commission and the conditions of its being issued by said board shall be as follows:   .  .  .   In case stocks, certificates, bonds, notes, or other evidences of indebtedness are to be issued partly or wholly for property or services or other consideration than money, the public utility or common carrier shall file with the commission a statement, signed and verified by the president or other chief officer having knowledge of the facts, showing (1) the amount and character of the stocks, certificates, bonds, notes or other evidences of indebtedness proposed to be issued; (2) the general purposes for which they are to be issued; (3) a general description and an estimated value of the property or services for which they are to be issued; (4) the terms on which they are to be issued or exchanged; (5) the amount of money, if any, to be received for the same in addition to such property, services or other consideration; (6) the total assets and liabilities of the public utility or common carrier; and (7) that the capital sought to be secured by the issuance of such stocks, certificates, bonds, notes or other evidences of indebtedness is necessary and required for such purposes and will be used therefor. The commission may also require the public utility or common carrier to furnish such further statements of facts as may be reasonable and pertinent to the inquiry, and shall have full power to ascertain the truth of all statements made by such common carrier or public utility. Upon full compliance by the applicant with the provisions of this section the commission shall forthwith issue a certificate stating the amount, character, purposes and terms upon which such stocks, certificates, bonds, notes or other evidences of indebtedness are proposed to be issued, as set out in the application for such certificate, and that the statements contained in such application have been ascertained to be true. Any issue of stocks, certificates, bonds, notes or other evidences of indebtedness not payable within one year, which shall be issued by such public utility or common carrier contrary to the provisions of this act shall be void." (Gen. Stat. 1915, § 8353.)

The application was in the form prescribed by the commission, covered all the facts required by the statute, and was duly verified. The application came on for hearing on April 27, 1917, and among other proceedings the following colloquy

occurred between the commission and Mr. Bigelow, a representative of and witness for the railway company:

"Commissioner Kinkel: Now, is it really necessary for the financial interest of the company that these additional bonds and stocks for this short additional mileage be issued, or is it just simply done for the purpose of carrying out a contract? In other words, have the proceeds of the stocks and bonds already issued paid for the equipment and road?

"Mr. Bigelow: To the construction company?

"Commissioner Kinkel: Yes.

"Mr. Bigelow: Oh, that you could not ascertain until they sell those securities. Of course the first mortgage has not.

"Commissioner Kinkel: The first mortgage was $20,000 a mile, was it not?

"Mr. Bigelow: Yes.

"Commissioner Kinkel: Do you recall how much a mile the road has cost you?

"Mr. Bigelow: No, I could not say, now. Mr. Williamson will be able to testify to the mileage, but he would not know anything about the securities.

"Commissioner Kinkel: Who would know about the cost of the road?

"Mr. Bigelow: Well, I know as much as anybody, but I would have to figure it up. We have not really completed the whole proposition, we will have to figure it up.

"Commissioner Foley: Well, we .will want that information, and we will continue the matter until a later time, when Mr. Williamson can be here, and prepared to furnish the information as to the milage constructed, and the cost."

At the second hearing held on May 18, the following took place:

"Commissioner Foley: What was the nature of your contract with the construction company?

"Mr. Bigelow: On the basis of $20,000 a mile for the first mortgage bonds, and $12,500 for the general mortgage, and stock $17,500 per mile.

"Commissioner Foley: Upon what basis, resting upon the authority given by the commission, did you feel authorized to make that kind of a contract with the construction company?

"Mr. Bigelow: Well, the contract with the construction company was previous to the authorization of the bonds. As a matter of fact, gentlemen, the capitalization perhaps is, as you must know yourselves, very small compared with other roads.

"Chairman Bristow: Well, that is of no consequence, as compared with other roads; as compared with the investment in the property is the only thing to go by.

. . . . . . . . . . . . . . . .

"Commissioner Foley: Do you know what a railway like that, constructed and built as that is, can be built for?

"Mr. Bigelow: Well, of course it costs more to-day than it did when it was built, as far as that is concerned, but our figures which we have given in the statement show the way the accounts stand at the present time—given in the application, I mean."

A statement of expenses incurred in constructing the road to Lawrence was produced by the railway company and received in evidence. It reads as follows:

THE KANSAS CITY, KAW VALLEY & WESTERN RY: CO.

ROAD EQUIPMENT ACCOUNTS.

| Account. | Amount. |
|---|---|
| No. 501 Engineering and superintendence................... | $53,913.95 |
| 502 Right of way ................................... | 146,072.44 |
| 503 Other land used in electric railway operations.... | 45,643.30 |
| 504 Grading ....................................... | 170,520.32 |
| 505 Ballast ....................................... | 67,772.07 |
| 506 Ties .......................................... | 99,228.25 |
| 507 Rails, rail fastenings and joints................. | 184,226.52 |
| 508 Special work ................................... | 10,203.82 |
| 510 Track and roadway labor........................ | 103,468.91 |
| 511 Paving ........................................ | 11,378.82 |
| 512 Roadway machinery and tools................... | 10,939.57 |
| 515 Bridges, trestles and culverts................... | 206,431.32 |
| 516 Crossings, fences and signs.................... | 20,001.42 |
| 517 Signals and interlocking apparatus.............. | 737.37 |
| 518 Telephone and telegraph lines................... | 4,403.85 |
| 519 Poles and fixtures.............................. | 31,785.29 |
| 521 Distribution system ........................... | 116,695.57 |
| 522 General office buildings........................ | 3,348.73 |
| 523 Shops and carhouses........................... | 13,760.39 |
| 524 Stations, miscellaneous buildings and structures... | 19,840.36 |
| 526 Park and resort property....................... | 155.66 |
| 527 Cost of road purchased......................... | 246,404.63 |
| 530 Passenger and combination cars................ | 80,557.44 |
| 531 Freight, express, and mail cars................. | 24,035.14 |
| 532 Service equipment ............................ | 4,119.96 |
| 533 Electric equipment of cars..................... | 16,915.31 |
| 534 Locomotives .................................. | 15,673.70 |
| 536 Shop equipment .............................. | 1,509.22 |
| 537 Furniture .................................... | 1,976.58 |
| 538 Miscellaneous equipment ...................... | 2,594.34 |
| 540 Substation buildings .......................... | 10,913.45 |
| 543 Substation equipment ......................... | 32,194.38 |
| 544 Transmission system .......................... | 5,552.13 |
| 546 Law expenditures ............................. | 16,893.92 |
| 547 Interest during construction.................... | 189,999.94 |
| 548 Injuries and damages.......................... | 496.32 |
| 549 Taxes ........................................ | 102.40 |
| 550 Miscellaneous ................................ | 227,464.02 |

May 1, 1917.                                    $2,197,930.81

The following then occurred:

"Commissioner Foley: You have a power plant of your own, have you?

36—101 Kan.

"Mr. Bigelow: No, sir.

"Commissioner Foley: You have no power plant?

"Mr. Bigelow: We buy our power from the municipal plant at Kansas City, Kansas.

"Commissioner Foley: I believe that is all.

"Chairman Bristow: Now, why should this cost you twice as much to construct that, as other roads that we know have been constructed, that are apparently just as good as that is?

"Mr. Bigelow: I can not tell you what other roads have done. You did n't seem to be interested in the amount other roads have issued in securities, but as a matter of fact, it is a great deal less than others.

"Chairman Bristow: Yes, that has been a scandal for years, but when it comes to investment in these pieces of property, that is a tangible thing. The securities are simply whatever you are disposed, or the commission is disposed to permit to be issued, entirely a different proposition.

"Mr. Bigelow: That is for you gentlemen to determine."

The commission made a general finding that upon consideration of the application and the evidence a certificate should be denied.

The litigants are far apart in their interpretations of the statute. The commission contends that the certification of securities to be issued by a public utility is a matter resting in its discretion, to be exercised according to its conception of the public welfare. The railway company contends that the commission has none but a ministerial duty to perform. Whenever a verified application in due form is presented, and any further pertinent information required by the commission is supplied, it becomes the mandatory duty of the commission to issue the certificate applied for. Neither contention is correct. The commission is not a general guardian over public utilities or the public, and can not, by an exercise of discretion over the issuing of bonds and stocks, control the activities of business enterprise. Business initiative and business sagacity are left free to improve what they deem to be opportunities, and a public utility has the right, under the statute, to issue whatever bonds and stocks may be necessary to carry out corporate powers, acquire property, construct and extend facilities, and maintain and improve service. The commission has no discretion to refuse to certify such securities. On the other hand, proposed securities must be necessary for some purpose designated in the statute, and the commission has full power to ascertain the truth of the statement, indispensable

to an application for a certificate, that the capital stock to be secured is necessary and required for such purpose and will be used therefor.

The word "necessary," as used in the statute, is not to be interpreted from the standpoint of some piratical corporation which might desire to exploit the public, or from the standpoint of some perverse commission which might conceive it to be public service to bait public utilities. "Necessary" means needful under all the conditions attending the enterprise.

Unless the commission see fit to accept the verified application as proving the statements which it contains, the applicant should extend its proof as the commission may indicate. Presentation of a verified application does not cast on the commission the burden of calling witnesses and establishing by adversary procedure the untruthfulness of the statements tendered or the true needs of the applicant.

In this instance the court is satisfied the railway company and the commission understood each other at the final hearing. The contract which the promoters of the railroad made with themselves to build the road for $50,000 per mile in bonds and stock did not create a necessity for issuing the stipulated securities, in the sense of the statute. If so, a necessity for bonds and stock at any improvident rate per mile could be created by simple contract. Possibly the contract which was made was induced by necessity, but if so, the necessity was the underlying fact. Although the previous order authorized securities which would fulfill the contract for the estimated number of miles, the order in terms provided for issuing securities in a gross sum to build the road to Lawrence. If more funds were needed, the necessity was a question of complex fact to be determined at the hearing on the second application. Comparisons between the capitalization of this road and the capitalization of other roads did not tend to elucidate the question of fact. As bearing upon the issue, the commission specifically asked for the cost of the road and adjourned the hearing to give the railway company an opportunity to respond. The response consisted of the general summary printed above, showing that the road, without a power plant, had a bookkeeping cost of more than $51,000 per mile. Nearly twenty per cent of the cost consisted of interest, $189,999.94, and the un-

explained ,item, "miscellaneous," $227,264.02.   Near the close of the first hearing and near the close of the second hearing the actual need for capital additional to that already certified was squarely presented to the representative of the railway company.   No information was forthcoming except the construction summary, the fact that the proceeds derived from the first-mortgage bonds were not sufficient to pay for the road, and the fact that the capitalization was smaller than that of other roads.

The conclusion of the court is that the commission had authority to require proof of need for additional capital beyond the proof afforded by the verified application; that the commission sufficiently indicated its desire for such proof; that substantial proof was not produced; and, consequently, that the certificate applied for was not arbitrarily refused.

The writ is denied.