STATE OF INDIANA, EX REL. INDIANAPOLIS TRACTION AND TERMINAL COMPANY, *v.* LEWIS ET AL.

[No. 23,420. Filed July 30, 1918.]

1. MUNICIPAL CORPORATIONS.—*Street Railroads.*—*Proceeding to Increase Fares.*—*Public Service Commission.*—A city in granting a franchise to a street railroad company fixing the rate of fares under §2, Acts 1899 p. 260, §5649 Burns 1914, was not a necessary party in a proceeding before the Public Service Commission to increase fares, since the city streets are a part of the public highway system of the state, and the city in granting the franchise was acting as the agent of the state. p. 567.

2. MUNICIPAL CORPORATIONS. — *Powers of Legislature.* — *Franchises.*—The legislature has power to consent to the surrender of a franchise granted by a city to a street railway company without the approval of the city. p. 568.

3. PUBLIC SERVICE COMMISSION. — *Powers and Duties.* — The Public Service Commission as created by Acts 1913 p. 167, §10052a Burns 1914, is a legislative agency, assumed to be qualified by knowledge and experience to regulate the public utilities of the state with reasonable fairness to both the public and the utilities. p. 568.

4. STATUTES.—*Construction.*—A statute, if possible, should be so construed as to give effect to all its provisions. p. 569.

5. CONSTITUTIONAL LAW. — *Obligation of Contracts.* — *Impairment.*—Although the legislature is inhibited by Art. 1, §10, of the federal Constitution from passing any act impairing the obligations created by franchise or contract, it should be noted that new conditions present, requiring the safeguarding of

public interests, will justify the state in exercising its reserve power in the regulation of persons or property to promote the health, the welfare or the interest of great public needs. p. 570.

6. CARRIERS.—*Rates.—Regulation.—Public Service Commission.* —Section 122, Acts 1913 p. 167, §10052s4 Burns 1914, authorizes the Public Service Commission in emergencies to regulate the rates of street railroads that have not surrendered their franchises under §101, but such power extends to set aside contractual relations only temporarily because of a public necessity. p. 571.

7. EVIDENCE.—*Judicial Notice.—Street Car Rates.*—If a street railroad company was receiving only a reasonable rate of fare before the war, it is a matter of common knowledge that it cannot, during the war, continue to furnish reasonable service under the old rate. p. 574.

8. CARRIERS.—*Regulation of Fares.—"Emergency."*—A petition by a street railroad company for an increase in the rate of fares which showed greatly increased expenses due to the war, showed an "emergency" within the meaning of §122, Acts 1913 p. 167, §10052s4 Burns 1914, and the refusal of the Public Service Commission to consider the petition on the grounds of no jurisdiction was error. p. 574.

9. MANDAMUS.—*Public Service Commission.*—Since the statute makes no provision for an appeal from an order of the Public Service Commission refusing to take jurisdiction of a petition seeking relief under §122, Acts 1913 p. 167, §10052s4 Burns 1914, and there being no other adequate remedy, mandamus will lie to compel the commission to take jurisdiction. p. 575.

From Marion Circuit Court (28,656); *Louis B. Ewbank,* Judge.

Mandamus proceedings by the State of Indiana, on the relation of the Indianapolis Traction and Terminal Company, to compel the Public Service Commission of Indiana to take jurisdiction of a petition to allow the relator to increase fares on its street cars. From a judgment sustaining a demurrer to the complaint, the relator appeals. *Reversed.*

*Ferdinand Winter* and *W. H. Latta,* for appellant.
*Ele Stansbury,* Attorney-General, for appellees.
*Woodburn Masson* and *Samuel Ashby, amici curae.*

MYERS, C. J.—On November 19, 1917, the relator filed with the Public Service Commission its petition showing in substance that it has operated a system of street railroads in the city of Indianapolis since the year 1902, charging for the carriage of passengers five cents when paid as a single cash fare; six tickets for twenty-five cents; twenty-five tickets for one dollar, with transfer privileges; that by reason of an emergency brought on by war activities in this country, the cost of every item entering into the operation and upkeep of the relator's business has increased so amazingly that without financial relief the relator must face insolvency, also rendering it unable to furnish reasonably adequate service to its patrons and to the injury of the interests of the people of the city of Indianapolis, and public generally depending upon street railway service. To meet this emergency the relator has asked permission to charge and collect from each passenger over five years of age carried upon its lines five cents, with transfer privileges as now in use, until the further order of the commission. To this petition the city of Indianapolis and various organizations and citizens of that city were permitted to intervene and enter special appearances before the commission, and object to the commission hearing said petition on the ground that it had no jurisdiction over the matter set forth in the petition. The commission sustained these objections and dismissed the petition. The relator then brought this proceeding in mandamus to compel the commission to take jurisdiction of the matter presented by the petition. Appellees' demurrer to the complaint was sustained, and, the relator refusing to plead further, judgment followed in favor of appellee. The ruling of the trial court on the demurrer to the complaint is here assigned as error.

It is first insisted that the city of Indianapolis is a necessary party to this action for the reason that it is

a party to the contract which the relator is seeking to have changed, to the injury of the city and its citizens. This contention cannot be sustained. The proposed change in no way affects the contract concerning any governmental function of the city, but is limited to the rate of fare fixed by the state (Acts 1899 p. 260, §2, §5649 Burns 1914) and incorporated into the contract or franchise between the city and the relator's lessor, and under which the relator is using the streets of the city. City streets are a part of the public highway system of this state, and such highways are arteries of commerce under the control of the state in its sovereign capacity as represented by the legislature. "It may either exercise the power itself directly, or may delegate it to municipalities, to quasi municipalities, or to any properly constituted body." 13 R. C. L. 79. Contracts as are here in question, although entered into by the city, are nevertheless contracts of the state on the one side, and the utility on the other. For, as said in the case of *Winfield* v. *Public Service Commission* (1918), *ante* 53, 118 N. E. 531, 533: "To the extent that the interests involved are not purely local to cities and incorporated towns, such power as a municipality has over them is granted to the municipality by the state, and may be modified or withdrawn by the state from the municipality, unless the state has waived its right to do so. Therefore, the municipality, so far as affects the public welfare, acts, in granting franchises to public service corporations, as the agent of the state, and cannot bind the state beyond the authority delegated by the state to the municipality in that respect. The existence of limitations of authority in the agent is known to all, because they are reservations by virtue of the state's police power."

In the present case the fixing of the rate of fare was not left to the municipality as is sometimes done. The

state, in this respect, acted in the interest of the public, and to the utility it was a condition for the privilege of using a portion of its highway system. Upon the facts before us we conclude that the city, in incorporating the rate schedule in the franchise in question, acted as the agent of the state, and of its authority in this respect the public, as well as the city, must take notice. The city was not a necessary party. In coming to this conclusion we were not unmindful of the rule applicable to contracts made for the benefit of third persons. That rule has no application to this class of cases.

The *amici curae* make the point challenging the power of the legislature to consent to the surrender of a franchise granted by a city without the latter's approval for the reason that it has the effect of destroying the right of local self-government, and is in violation of the Constitution. This court, in the case of *Winfield* v. *Public Service Commission, supra,* decided that question against such contention, and upon a further consideration we adhere to our former ruling on that point.

The relator is relying on §122, Acts 1913 p. 167, §10052s4 Burns 1914. It has not surrendered its contract made with the city March 6, 1899, to run thirty-four years. That act, §101 (§10052x3 Burns 1914), expressly gave all public utilities operating in this state until July 1, 1915, to surrender their contracts, and to continue under an indeterminate permit. Later that time was extended to July 1, 1917. Acts 1915 p. 457. No further extensions have been granted.

The real question for decision involves an examination of certain sections of the act of 1913, *supra* (§10052a *et seq.* Burns 1914), creating the Public Service Commission, and to which it must look for its duties and its authority. The Public

Service Commission is not a legislature, although when exercising its rate-making power it is performing a legislative act. It is not a court, yet in certain matters its acts, in a sense, are quasi-judicial. More strictly speaking, it is an administrative body, charged with ministerial and in some instances with legislative duties (4 R. C. L. 623) ; or, in other words, it is a legislative agency, assumed to be qualified by knowledge and experience to regulate the public utilities of the state with reasonable fairness and substantial justice, not only to the public, but to the utility as well. Such is the theory of the law, and, unless conscientiously administered, its purpose is destroyed.

Sections 7, 47, 57, 64, 72 and 122 have to do with rate making, but the question before us for decision requires us to consider only §§7 (§10052g Burns 1914) and 122, *supra.* Section 7 has been construed. *Winfield* v. *Public Service Commission, supra.* In that case the utility had surrendered its franchise, and at the time it applied to the commission for an increase of rates, it was acting under an indeterminate permit. In the present case relator is operating under its contract. It claims the benefits of the commission's rate-making power, because there is no provision in the law expressly denying it this right. If its position in this particular is correct, then §101, *supra,* as amended in 1915, fixing the time within which public utilities might surrender their contracts, was meaningless.

The doctrine is elementary that legislative action, if possible, should be so construed as to give effect and meaning to all its provisions. The 1913 Public Utility Act, *supra,* introduced a new departure in the handling of public utilities, and was effective to withdraw from the municipalities certain powers theretofore exercised by them. The purpose of this law

was, in part, to correct through an unprejudiced tribunal certain unfair action against the people by the utility, or by the people against the utility, and, in so far as possible, to fix a uniform procedure throughout the state for all concerned. At the time this law was passed the legislature knew that all public utilities of the state were using the streets and public thoroughfares of cities and incorporated towns as well as other public highways by consent of the state directly given, or through its regular constituted representatives. It also knew that, as to all these utilities operating under an unexpired franchise or contract, it was inhibited by the federal Constitution, Art. 1, §10, from passing any law impairing these obligations. *Vicksburg Water Works Co.* v. *Vicksburg* (1901), 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808; *Grand Trunk, etc.. R. Co.* v. *City of South Bend* (1912), 227 U. S. 544, 33 Sup. Ct. 303, 57 L. Ed. 633, 44 L. R. A. 405; *Northern Ohio Traction, etc., Co.* v. *Ohio* (1917), 245 U. S. 574, 38 Sup. Ct. 196, 199, 62 L. Ed. 481.

To this general proposition, however, it should be noted that new conditions present, requiring the safeguarding of public interests, will justify the state 5. in exercising its reserve power in the regulation of persons or property to promote the health, welfare, or the interest of great public needs. *United Railroads* v. *City of San Francisco* (1917), 239 Fed. 987, 996; *Williams* v. *Citizens' R. Co.* (1891), 130 Ind. 71, 73, 29 N. E. 408, 15 L. R. A. 64, 30 Am. St. 201. "But it has never been held that under the guise of the police power property may be taken arbitrarily or confiscated." *School Town of Andrews* v. *Heiney* (1912), 178 Ind. 1, 7, 98 N. E. 628, 43 L. R. A. (N. S.) 1023, Ann. Cas. 1915B 1136. The legislature, in passing the law of 1913, *supra*, impliedly, at least, recognized its

utility contracts as enforceable obligations. It expressly gave any such utilities applying within a fixed time the right to surrender their contracts, to come in under the new law, and receive indeterminate permits. The time limit expired June 30, 1917. At this time we find no legislative consent for the surrender of such contracts other than that conferred upon municipalities under their general powers, and subject to the approval of the commission. Treating the contract in full force, we therefore hold that the maximum rate therein fixed must govern (§7, *supra*), unless relator is within the provisions of §122, *supra*. That section reads as follows: "The commission shall have power, when deemed by it necessary, to prevent injury to the business or interests of the people, or any public utility of this state, in case of any emergency to be judged of by the commission, to temporarily alter, amend, or with the consent of the public utility concerned, suspend any existing rates, schedules and order relating to or affecting any public utility or part of any public utility in this state. Such rates so made by the commission shall apply to one (1) or more of the public utilities in this state or to any portion thereof as may be directed by the commission, and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission."

The language of this section is broad in its terms, and comprehensive in meaning. The whole law contemplates service supervision by the commission.

6. To that end the law should be liberally construed, with a view to public welfare. In our opinion this section is applicable to all public utilities of the state, regardless of the authority under which they are operating, and in positive terms confers upon the commission certain well-defined duties. No one will ques-

tion the right of the state to regulate public utilities to the extent, at least, of requiring them to furnish reasonable and adequate service consistent with all the surrounding circumstances. It may demand the doing of such other acts as may be necessary to keep the state informed concerning the utility's business with the public. Generally speaking, these powers have been conferred upon the Public Service Commission of this state.

Relator's petition presents a financial condition brought about by circumstances over which the state, city, or relator has or had no control whatever. It is evident that, if not now, it will soon be unable to furnish reasonably adequate service, not only for the want of cars, but through failure to keep them in reasonably safe repair, and efficiently manned to reasonably protect from danger those who from necessity must use its service. The burden was on the relator to present a case of emergency to be judged of by the commission, and if deemed by it necessary to prevent injury to the business or interests of the people or any public utility of this state, it might temporarily alter any existing rates, or, with the consent of the public utility concerned, suspend any rate then in force. This section contemplates the use of the state's reserved power, but this power does not extend to formally annul or set aside contractual relations other than temporarily to meet a public necessity. Under this section the commission may judge of the full scope and requirements of the emergency, its probable effects and duration, and to make such order as the exigencies of the case demand.

We are not to be understood as holding that the mere fact of threatened insolvency alone will justify the commission in taking jurisdiction of the petition, for such condition may have arisen through negligent or careless management, lack of business sagacity, or other-

wise, and far from being within the meaning of the word "emergency" as used in the statute. The word "emergency" is defined by Webster as "any event or occasional combination of circumstances which calls for immediate action"; by the Century Dictionary as "a sudden or unexpected happening; an unforeseen occurrence or condition." The American Dictionary defines it as "a combination of circumstances requiring immediate action or remedy; an unexpected event; an unforeseen casualty."

Section 122 of our law, *supra,* is the same as §99 of the Wisconsin public utility law. The commission of that state has placed a construction on the word "emergency." It said: "We believe that the emergency provision of the Public Utility Law was intended not to take care of minor variations in the expenses of a utility, but that it was intended to afford a measure of relief only in such cases as would clearly be defined as emergencies in which the ordinary remedies would be inadequate to afford the relief needed, or in which, because of the temporary nature of changed conditions, only a temporary relief need be afforded. In order to judge of the necessity of emergency relief in a particular instance, it seems to us necessary to consider what the experience of the utility has been at times when conditions have been normal and how seriously the changed conditions have affected it. For a utility which has been operating on a small margin of profit, an emergency warranting relief might exist under circumstances which would not warrant the granting of such relief to a utility which has had a very profitable business." *Re Manitowoc Gas Co.* (1917), P. U. R. 1918A 710.

The case of *Railway Co.* v. *Utilities Commission* (1917), 101 Kan. 557, 167 Pac. 1138, P. U. R. 1918A 732, was an action in mandamus to compel the commis-

sion of that state to validate a proposed bond and stock issue of the company. The statute considered provided that: "A public utility or common carrier may issue stocks, certificates, bonds, notes or other evidences of indebtedness, payable at periods of more than twelve months after the date thereof, when necessary for the acquisition of property," etc. The court, in construing the word "necessary" said: "The word 'necessary,' as used in the statute, is not to be interpreted from the standpoint of some piratical corporation which might desire to exploit the public, or from the standpoint of some perverse commission which might conceive it to be public service to bait public utilities. 'Necessary' means needful under all the conditions attending the enterprise."

Every sane person has long since realized the critical and abnormal condition of this country in every avenue of business. A living wage three years 7. ago is a starvation wage today. The cost of all commodities, regardless of kind or class, has increased until there is not now a semblage of normal prices. If relator was receiving only a fair and reasonable rate of fare five years ago, under present conditions, we know from common knoweledge that it cannot long continue and furnish reasonable service at the old rate. That is a matter for the commission, and the legislature has wisely made provision whereby existing conditions may be met and handled to the reasonable protection of all concerned.

In our opinion the petition in the case at bar presented a state of facts over which the commission had jurisdiction, and its refusal to consider the same 8. was error. Our statute makes no provision for an appeal from such order, nor does the law

afford the relator an adequate and specific rem-
9.   edy.   This being true, a common-law writ of
mandamus will issue to the commission requiring
it to take jurisdiction of the petition.   *Public Service
Com.* v. *State, ex rel.* (1915), 184 Ind. 273, 111 N. E.
10; *Flournoy* v. *City of Jeffersonville* (1861), 17 Ind.
169, 174, 79 Am. Dec. 468; *Crane* v. *Camp* (1838), 12
Conn. 464.

Judgment reversed, with instructions to overrule the
demurrer to the complaint, and for further proceedings
in accordance with this opinion.

Harvey, J., concurs in conclusion.   Spencer, J., dis-
sents.

Note.—Reported in 120 N. E. 129.   Municipal corporations:
regulation of street railroads, 104 Am. St. ₊638.   Statutes: con-
ferring power to fix rates, validity, Ann. Cas. 1917C 57.   Man-
damus: control of acts of Public Service Commission, Ann. Cas.
1914D 795.