### PUBLIC SERVICE COMMISSION *v.* GIRTON.

[No. 23,669.   Filed November 16, 1920.]

1. PUBLIC SERVICE COMMISSION.—*Power Over Rates in Force Prior to Creation of Commission.—Telephones.*—By the law creating it, the Public Service Commission has power, upon the petition of a public telephone corporation, created and operating before the creation of the commission, to regulate and increase rates and charges.   p. 633.

2. TELEGRAPHS AND TELEPHONES.—*Contract of Sale Containing Agreement as to Rates.—Effect Upon Power of Public Service Commission.*—A contract of sale of telephone lines, etc., by individuals to a corporation, containing an agreement by the latter never to make any greater charge to the then subscribers than the rates then in force except by the written consent of the vendors, and which such corporation had observed for a number of years, both before and after the creation of the Public Service Commission, was ineffective to deprive the commission of any power given it by statute to regulate such rates.   p. 634.

From Shelby Circuit Court; *David L. Wilson,* Special Judge.

Action by Jacob W. Girton against the Public Service Commission. From a judgment enjoining the defendant from enforcing an order regulating telephone rates, the defendant appeals. *Reversed.*

*Ele Stansbury,* Attorney-General, and *U. S. Lesh,* for appellant.

*Wray & Sullivan,* for appellee.

EWBANK, J.—In March, 1900, the appellee and another, who together owned certain telephone lines radiating from the village of Flat Rock, in Shelby county, Indiana, along the public highways, in which they had been built under a general franchise grant from the county board of commissioners, sold the lines, switchboard and instruments to the Flat Rock Telephone Company, a corporation. The vendors then had subscribers for thirty-three telephones, including the appellee. The sale contract recited a conveyance in consideration of $900 paid and the delivery to the vendors of eight shares of stock in the purchasing company, with an agreement by said company to install a new switchboard and to complete the conversion of the lines into a metallic system, and to perform existing contracts of the vendors, and then continued:

> "And said Flat Rock Telephone Company further agrees not to make any greater charge on the present subscribers than they are now paying to the said Vendors, except by the written consent of said (vendors) and   *   *   *   that should said company make a contract to connect their switchboard with one in Edinburg·   *   *   *   Shelbyville, Hope and Columbus, Ind., services to said towns are to be maintained to the present sub-

scribers to the Flat Rock switchboard on the said
exchange without any additional charges to their
monthly telephone rent.''

It does not appear that the franchise under which
the telephone company operates along the public high-
ways contains a provision fixing or limiting the rates
to be charged for telephones, nor are we apprised of
any power which the board of commissioners would
have to impose a limitation upon the rates charged as
a condition of granting such a franchise.

So far as is shown, the purchasing company con-
tinued to charge all subscribers at the rates referred
to in the contract for a period of more than eighteen
years, during which the number of telephones rented
increased from thirty-three to 210, and the value of
the property increased to $6,000 or $8,000, besides
paying the total sum of $1,000 in dividends.

Appellee was a subscriber at the time of said pur-
chase, in 1900, and continued to be one at all times,
and so did two or more others. Four or more of the
subscribers in 1900 had ceased to be subscribers in
1918, but it does not appear just how many of the
original subscribers had dropped out.

In September, 1917, the salary of the man who
served the telephone company as superintendent and
lineman was increased from $1.50 per day to $50 per
month and, in March, 1918, to $75 per month. In
November, 1917, the wages of the girls who worked
as operators was advanced from sixty-five cents per
day to $1 per day. And at the time of the hearing
before the Public Service Commission, in November,
1918, the manager and lineman was demanding $100
per month, and each of the operators $1.20 per day,
which the company professed a willingness to pay, if

granted an increase of rates. There was evidence tending to show that, even without making such proposed increases of salaries, the current income of the company, at the rates previously charged, would not meet the current operating expenses, allowing nothing for depreciation, nor any return on the capital invested.

There was no evidence that the company had surrendered its franchise and taken out an indeterminate permit, the witnesses testifying without contradiction that it had not done so.

On December 4, 1918, the Public Service Commission ordered that the company might increase its rates twenty cents per month for each of certain residence telephones, and might charge fifty cents per month for each extension phone, and twenty-five cents for each extension bell.

There is ample evidence to sustain the decision of the commission if it was authorized by law to make such an order in such a case.

Upon petition of the appellee the circuit court adjudged that the order of the appellant, Public Service Commission, was unlawful, and enjoined said appellant from enforcing it, from which judgment an appeal was duly taken.

The only error assigned is the overruling of appellants' motion for a new trial, on the alleged grounds that the finding and decision is not sustained by sufficient evidence and is contrary to law. And the only questions discussed in the briefs relate to (1) the power or lack of power of the Public Service Commission, on petition of a public telephone corporation created and organized before the enactment of the Public Service Commission Law, to regulate and

increase the rates charged by such corporation, and (2) the effect of appellee's contract with the telephone company as depriving or not depriving the commission of the right to exercise such power by increasing rates, if the power of regulation exists.

The statute creating the Public Service Commission, Acts 1913, ch. 76, p. 167, §10052a *et seq.* Burns 1914, and defining its duties and powers provides as follows: "Sec. 57. Upon a complaint made against any public utility by any mercantile, agricultural or manufacturing society or by any body politic or municipal organization or by ten persons, firms, corporations or associations, or by ten complainants of all or any of the aforementioned classes, or by any public utility, that any of the rates, tolls, charges or schedules or any joint rate or rates in which such petitioner is directly interested are in any respect unreasonable * * * the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. * * * §10052e2 Burns 1914.

Sec. 64. Any public utility may make complaint as to any matter affecting its own rates or service with like effect as though made by any mercantile, agricultural or manufacturing society, body politic or municipal organization or by ten persons, firms, corporations or associations. §100521l2 Burns 1914.

Sec. 72. Whenever, upon an investigation, the commission shall find any rates, tolls, charges, schedules, or joint rate or rates to be unjust, unreasonable, insufficient or unjustly discriminatory * * * the commission shall determine and by order fix just and reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed in the future

in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential, or otherwise in violation of any of the provisions of this act.'' §10052t2 Burns 1914.

And there is nothing whatever in the statute which suggests a legislative intent to limit the authority thus conferred upon the Public Service Commission to fix and, in a proper case, to increase the rates charged by ''any public utiilty,'' upon its petition for relief, so far as the legislature has constitutional power to grant such authority. And a corporation operating a public telephone line is a ''public utility.'' §10052a, *supra*.

It has been repeatedly decided by the courts of last resort of the United States and of the different states that, where public officers, acting under legislative authority, have made a contract with a public service corporation, upon a valuable consideration, granting to it, for a time not longer than permitted by the constitution and laws of the state, the right to charge a designated price or rate for a certain service which it has thereby undertaken to perform, the state cannot impair the obligation of such contract by diminishing the rate charged, without the consent of such public service corporation. *Grand Trunk, etc., R. Co.* v. *City of South Bend* (1913), 227 U. S. 544, 33 Sup. Ct. 303, 57 L. Ed. 633, 44 L. R. A. (N. S.) 405; *Northern Ohio Traction, etc., Co.* v. *Ohio* (1918), 245 U. S. 574, 38 Sup. Ct. 196, 62 L. Ed. 481, L. R. A. 1918E 865; *Detroit United Ry.* v. *Detroit* (1919), 248 U. S. 429, 39 Sup. Ct. 151, 63 L. Ed. 341.

Though it has been held that even where a city has made such a contract by legislative authority the rates can be increased by action of the Public Service

Commission under authority granted by the
1. state legislature, with the consent and upon
petition of the public utility corporation, but
without the consent of the city. *Winfield* v. *Public
Service Commission* (1918), 187 Ind. 53, 118 N. E.
531; *State, ex rel.* v. *Lewis* (1918), 187 Ind. 564, 120
N. E. 129; *Farmers', etc., Tel. Co.* v. *Boswell Tel. Co.*
(1918), 187 Ind. 371, 119 N. E. 513; *City of Englewood*
v. *Denver, etc., R. Co.*, 248 U. S. 294, 39. Sup. Ct. 100,
63 L. Ed. 253.

But in this case the contract relied on by the appel-
lee was not entered into with any public officers, nor
on behalf of the state or any of its subdivisions, and
was not authorized by action of the legislature, taken
either before or after it was made. And the corpora-
tion is shown to have consented to and expressly re-
quested the change of rates, as ordered by the Public
Service Commission.

Appellee takes the position that his contract limit-
ing the future rates to be charged constituted prop-
erty of which he cannot be deprived except by the ex-
ercise of the power of eminent domain, upon payment
cf compensation.

If the contract had stipuated that the corporation
was to furnish telephone service to appellee at a speci-
fied rate for a designated period or during his life-
time, and he had procured an injunction against in-
creasing the charge as against himself during such
period, we should have an entirely different question,
the decision of which is not necessary in disposing of
the case at bar. But this contract was for the limita-
tion of rates to be charged by a public utility during
the pleasure of two individuals, appellee and another,
"not to make any greater charge on the present sub-

scribers than they are now paying    *    *    *    except
by the written consent of said Pleak and Girton.''
And the plaintiff obtained a judgment providing, in
general terms, ''that the defendant, the Public Service
Commission of Indiana, be and it is hereby enjoined
from enforcing said order'' that higher rates might
be charged without obtaining appellee's consent.

If this contract were valid, then in the absence of
the statute creating the Public Service Commission,
and prior to its enactment, it would have been pos-
sible for an individual, by contract with a corporation
operating a line of telegraph or telephone wires, a
railroad, street railroad, warehouse, heat, light or
power plant, water company, cab line, truck line, or
other device for serving the public, to require it to
obtain his written consent before its charges to the
public could be reduced, even though commanded by
legislative enactment or city ordinance, as well to
exact such consent before the charges could be in-
creased. For appellee, being a stockholder as well as
a subscriber, might have exacted a contract that only
by his written consent should the purchasing corpora-
tion reduce the rates charged to subscribers, as well
as that it should not increase them without such con-
sent.

We know of no authority holding that a contract
between an individual and a person or corporation
operating a ''public utility'' can take away or
2.    affect the police power of the state to regulate
and control the relations between such person
or corporation and the general public, including the
regulation of charges.

It may be and is possible for the state, by contract,
to surrender some part of its police power in the

matter of fixing the charges to the public for a public service. But it is not possible for a private citizen, by his contracts with other citizens or private corporations engaged in the performance of a public service, to take away, abridge or limit the power of the state to regulate and fix the charges which may be exacted from the public for such service.

The finding and decision of the circuit court was not sustained by the evidence, and a new trial should have been granted. The judgment is reversed, with costs, and the cause is remanded, with directions to sustain appellant's motion for a new trial.

Myers, C. J., not participating.