**CITIZENS ACTION COALITION OF INDIANA, INC., City of Terre Haute, and Save the Valley, Inc., Appellants (Intervenors Below),**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, Office of the Utility Consumer Counselor, Industrial Energy Consumers Group and Wabash Valley Power Association, Appellees (Petitioner and Intervenors Below).**

No. 93A02–8806–EX–239.[1]

Court of Appeals of Indiana, First District.

May 21, 1991.

1. This case was reassigned to this office on January 2, 1991.

**1272**

Michael A. Mullett, Columbus, Max E. Goodwin, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, for appellants.

Jerry Jacobi, Robert K. Johnson, Office of Utility Consumer Counselor, Indianapolis, Jon D. Noland, Duejean C. Garrett, Kay E. Pashos, Public Service Co. of Indiana, Inc., Plainfield, Virgil L. Beeler, Fred E. Schlegel, Mary M. Stanley, Baker & Daniels, Indianapolis, for appellees.

ROBERTSON, Judge.

This appeal is one of four appeals brought by Citizens Action Coalition, Inc., the City of Terre Haute, and Save The Valley, Inc. (collectively referred to as CAC) to challenge the emergency regulatory treatment of the Public Service Company of Indiana, Inc. (PSI) following its abandonment of the Marble Hill electrical generating station. In this appeal, CAC seeks judicial review of the June 1, 1988, order of the Indiana Utilities Regulatory Commission (IURC) which authorized a $50 million refund to ratepayers and a phased, 13.2% reduction in retail electric rates, to be funded in part by the accelerated recognition of deferred tax credits. CAC alleges that the IURC was compelled by statute and the federal and state constitutions to hold what we will refer to as a permanent rate setting hearing and to issue findings on the matters pertinent to traditional rate-making when it acted on June 1, 1988.

A brief recapitulation of PSI's recent history with the IURC would be helpful in understanding the issues raised in this appeal. In March, 1986, pursuant to the authority granted it under Ind.Code 8-1-2-113, the IURC instituted emergency measures designed to offset PSI's negative equity account, mitigate PSI's cash flow and credit problems, and permit a return to financial health, at least by December 31, 1989. Among other things, the IURC authorized rate increases totaling 13.2% and the creation of a "regulatory asset" through the capitalization of future tax benefits associated with the loss realized from the abandonment of Marble Hill which would be recognized over the following four years from the taxable income generated by the rate increases and other emergency restrictions. The IURC expressly contemplated in its 1986 order the need for continuing oversight and review in light of changes in the financial stability of PSI which might occur in the coming four years.[2] It directed PSI to initiate permanent rate proceedings by petition in 1989.

The proceedings leading to this appeal began about a year and one-half into the four-year recovery period envisioned by the 1986 order, when, on October 26, 1987, CAC filed with the IURC a petition pursuant to I.C. 8-1-2-54 by which it sought a rate reduction and the setting of permanent rates.[3] Before any action had been

---

**2.** This court upheld the 1986 order in Cause No. 93A02–8604–EX–115 in *Citizens Action Coalition v. Public Service Co.* (1990), Ind.App., 552 N.E.2d 834, *trans. denied.*

**3.** In its complaint, CAC alleged that the present rates were excessive, extortionate and beyond the value of services rendered to PSI's customers because the rates reflected (1) an authorized rate of return (14.79%) which was clearly excessive in relation to the present cost of capital to the utility; (2) charges to cost of service for non-existing income tax expense, thereby dis-

taken by the IURC on CAC's petition, PSI petitioned for a modification of the 1986 order, thereby invoking the IURC's jurisdiction under the pending, emergency cause. The IURC ruled in both causes on February 3, 1988.

In the order issued in cause no. 38411, the action initiated by CAC's petition, the IURC indicated its intent to utilize the authority granted it by I.C. 8–1–2–58 to initiate an investigation under the pending emergency cause, no. 37414, consistent in scope with the issues identified and addressed in its finding no. 8. In finding no. 8, the IURC concluded that reasonable cause existed to explore the extent to which PSI's financial emergency had been ameliorated. The prospective reasonableness of PSI's current rate of return would be explored *in determining whether the financial emergency remained or had been ameliorated.* The investigation would include the staff's recommendation as to the level of revenues, and resulting rates and charges, which would be just and reasonable "prospectively." The IURC also determined that the establishment of PSI's current tax treatment and the creation of the regulatory asset should not be reconsidered, although the continuing usefulness of such treatment could be explored. Finally, the IURC indicated its unwillingness to investigate again the question of PSI's used and useful property but would permit exploration of the reasonableness of PSI's unit power buy-back arrangement on a prospective basis.

In that February 3, 1988 ruling in cause no. 38411, the IURC also granted CAC intervenor status in pending cause no. 37414, vacated the previously set prehearing conference on the allegations of CAC's petition and terminated the cause.[4] CAC

did not seek judicial review of the IURC's February 3, 1988 actions, including its decision to proceed under the authority granted it by I.C. 8–1–2–58, or in any way challenge the bounds set by the IURC on its investigation; neither did CAC refile its petition under the pending emergency cause number.

Thereafter, in cause no. 37414, the IURC held a prehearing conference concerning the investigation, CAC participating, and issued two prehearing conference orders by which it outlined the schedule and procedure for its investigation. Identifying the threshold question for investigation as the need for continuing emergency treatment, the IURC set a "preliminary" hearing to explore the extent to which the conditions creating the financial emergency, found to exist in 1986, had changed. The prehearing conference order of February 24, 1988 (R. 339) reads:

> If, as a result of the preliminary hearing, the Commission finds conditions changed, certain modifications to the 1986 order may become necessary. For example, the non-refundability of PSI's rates may be removed, restrictions on dividends for PSI's common stock may be removed, or the emergency rates may even be terminated. *A subsequent hearing should then be conducted for the purpose of determining appropriate rates.* (Emphasis supplied.)

The IURC scheduled and held a four-day hearing on PSI's petition for modification of rates,[5] in which CAC participated and the other parties presented evidence concerning the proposal and the appropriate level of reduction which could be accomplished by that vehicle. After four more days of preliminary hearings in which CAC

---

guising a hidden return to shareholders; (3) charges to the cost of services in lieu of tax expense, thereby disguising a hidden return to shareholders; and (4) inappropriate charges to retail customers for excess generating capacity.

4. The author of this opinion concedes that the court mischaracterized the IURC's action as a dismissal in *Indiana Utility Regulatory Commission v. Citizens Action Coalition of Indiana* (1989), Ind.App., 540 N.E.2d 88, *trans. denied.*

5. Though characterized as a reduction in rates, what PSI sought was authorization to refund certain deferred taxes resulting from timing differences between tax and rate accounting at an accelerated pace, essentially, a restructuring of its balance sheet to offset the negative effect on equity of a rate reduction. Thus, the virtue of this proposal was that it offered a means to provide cash to ratepayers while permitting the continued recovery of PSI's equity.

took the position and offered evidence that PSI's emergency was over and permanent rate setting proceedings should begin, the IURC determined, based upon testimony of record, that to initiate a permanent rate investigation at that time would be premature.[6] Though PSI's financial health had improved as hoped, the IURC was concerned that full recognition of the regulatory asset might be jeopardized if it shortened the recovery period by nine months [7] and by the structure of PSI's equity. Accordingly, it continued all aspects of the emergency treatment initiated in 1986 but adjusted the rate schedule by permitting the maximum reduction which could be accomplished by accelerating the recognition of deferred tax income. With the cancellation of the previously-set hearing to investigate permanent rates, this appeal ensued.

We perceive the issues as being:

1. Whether the rates established by the June 1, 1988 order are contrary to law in that the IURC set them without holding the permanent ratemaking hearing requested by CAC when it filed its I.C. 8-1-2-54 [8] petition;

2. Whether the adjustment in rates occasioned by the order under review is contrary to law because it is neither based on the findings or on evidence ordinarily necessary in nonemergency ratemaking settings nor made subject to refund; and

3. Whether the procedure followed by the IURC deprived CAC of due process of law.

The issues raised in this appeal are so closely related that for the sake of expediency we will treat them as one.

 Any analysis of the IURC's actions in this case must begin with the understanding that at the time CAC filed its § 54 petition,[9] PSI was only fifteen months into a four-year recovery program created by the IURC to bring the utility back to financial health. Without question, the authority vested in the IURC through § 113 to act when confronted by emergency circumstances is broad, broad enough to permit the IURC to "judge of the full scope and requirements of the emergency, its probable effects and duration, and to make such orders as the exigencies of the case demand." *State ex rel. Indianapolis Tractor & Terminal Co. v. Lewis* (1918), 187 Ind. 564, 572, 120 N.E. 129, 131. There can be no dispute, then, that the IURC had the power in 1988, when considering the reasonableness of PSI's emergency rates, to evaluate the extent of PSI's recovery and determine for itself the duration of the emergency. After an investigation and hearing devoted to that question, the IURC concluded, as it could, that emergency regulatory treatment continued to be warranted and that only an adjustment in rates which did not retard PSI's recovery was just and reasonable.

Irrespective of the reason for PSI's apparently good financial health, CAC claims that it was entitled, by virtue of the filing of its petition, to obtain the relief sought

6. CAC does not contest the evidentiary basis for this finding.

7. The IURC, by its actions, needed to continue to assure the accounting and other regulatory agencies involved that PSI would have the taxable income to fully exhaust the regulatory asset in order to obtain permission for PSI to show the remaining deferred tax benefits as an asset and to prevent those agencies from requiring PSI to write-off the entire Marble Hill loss immediately against equity.

8. From this point on, we will refer to the sections of I.C. 8-1-2 by their section number.

9. Indiana Code Section 8-1-2-54 provides, in relevant part: Upon a complaint made against any public utility by ... ten (10) persons,

firms, corporations or associations, or ten (10) complainants of all or any of the aforementioned classes ... that any of the rates, tolls, charges or schedules ... are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act whatsoever affecting or relating to the service of any public utility, or any service in connection therewith, is in any respect unreasonable, unsafe, insufficient or unjustly discriminatory, or that any service is inadequate or can not be obtained, the commission shall proceed, with or without notice, to make such investigation as it may deem necessary or convenient. But no order affecting said rates, tolls, charges, schedules, regulations, measurements, practice or act, complained of, shall be entered by the commission without a formal public hearing.

therein, namely, the opportunity to litigate matters ordinarily related to the setting of permanent rates. PSI and the Utility Consumer Counselor (UCC) insist that CAC's argument boils down simply to disagreement with the IURC over the proper time for permanent ratemaking proceedings.

■■■ With this latter proposition, we must agree. If CAC's construction of § 54 were accepted, the conclusion of one proceeding would signal the next and just and reasonable rates for consumers would always be one proceeding away. The IURC had the authority under § 113, when faced with CAC's demand for permanent rates, to evaluate the advisability of such an action as it related to the exigencies which prompted PSI's present regulatory treatment. As an administrative agency, it also had the authority to control the range of investigation in ascertaining what is to satisfy the requirements of the public interest. *Interstate Commerce Commission v. Jersey City* (1944), 322 U.S. 503, 516, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420. In deciding that a return to traditional ratemaking was premature and only a midcourse adjustment in the emergency treatment established in 1986 was in order, it was required by statute, *see* § 72, and the Constitution, only to give notice and a full and fair hearing. The IURC fully complied with this requirement. CAC had two opportunities to challenge the level of reduction proposed by the UCC and ultimately adopted by the IURC, but CAC failed to offer evidence that such a proposal was unreasonable or extortionate.

CAC maintains, however, that in determining not to seek judicial review of the IURC's February 3, 1988 order, it relied "on the Commission's express ruling that it was not granting PSI's motion to dismiss its complaint, but instead was ordering the investigation requested in [its] prayer for relief." CAC insists that it relied upon IURC's February orders and upon the scheduled permanent rate proceedings to its detriment in deciding to postpone the testimony of its expert concerning the issues raised in its complaint until the ratemaking phase of the investigation.

■■ Contrary to CAC's assertions, the February 3, 1988 ruling did not "effectively consolidate" CAC's petition nor did it grant CAC the investigation and hearing it requested. What the order did do was grant CAC "partial relief" in the form of intervenor status in the pending emergency docket to pursue certain enumerated issues which might develop in the IURC's own *§ 58* investigation. An intervenor enters the proceedings in the procedural posture it finds them on the date of intervention. *L.S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), 169 Ind.App. 652, 351 N.E.2d 814, 830, *trans. denied. Cf. Vinson v. Washington Light Gas Co.* (1944), 321 U.S. 489, 498, 64 S.Ct. 731, 735, 88 L.Ed. 883 (Price administrator/intervenor not permitted to alter and enlarge investigation into sliding scale arrangement into propriety of rate base, operating expenses and rate of return simply by summarizing petition as demand for "full and complete inquiry for purpose of determining what are fair and reasonable rates"). As we pointed out initially, the IURC was not engaged in ratemaking at the time, but was adjusting emergency rates set pursuant to § 113.

■■ Indiana Code 8–1–2–58 and 59 make a hearing dependent on the outcome of the IURC's investigation. Indiana Code § 58, 59 provide:

Sec. 58. Whenever the commission shall believe that any rate or charge may be unreasonable or unjustly discriminatory . . . or that an investigation of any matters relating to any public utility should for any reason be made, it may, on its motion, summarily investigate the same, with or without notice.

Sec. 59. If, after making such investigation, the commission becomes satisfied that sufficient grounds exist to warrant a formal hearing being ordered as to the matter so investigated, it shall furnish such public utility interested a statement notifying the public utility of the matters under investigation. Ten (10) days after such notice has been given, the commission may proceed to set a time and place

for a hearing and an investigation, as hereinbefore provided.

Consequently, if CAC relied upon either the grant of an investigation under § 58 and § 59 to obtain the desired permanent rate hearing, or the permanent rate hearing which was scheduled prior to the completion of the IURC's § 58 investigation, in determining either not to appeal the February 3, 1988 ruling or when to present its evidence, CAC's reliance was not reasonable. *See Coghill v. Badger* (1981), Ind. App., 418 N.E.2d 1201, 1209. Neither was CAC justified in relying upon the IURC's February 24, 1988 prehearing conference order which set the permanent rate investigation and hearing, for that order expressly made a subsequent hearing conditional upon the result of the preliminary hearing which had been dedicated to the issue of change in emergency conditions.[10]

With respect to CAC's contention that the IURC's findings are inadequate, CAC argues that the IURC's failure to take evidence on each of the components employed in a permanent rate setting case and to issue specific findings of basic and ultimate fact on each of these considerations requires that we vacate the June 1, 1988 modification order and direct the IURC to hold a hearing and issue an order which includes findings "normally required to establish just and reasonable rates." Emergency or not, CAC maintains that the IURC is never relieved of the obligation to set just and reasonable rates.

 We cannot take issue with the proposition that rates approved pursuant to § 113 and § 72 must still be reasonable and just within the meaning of § 4 and the Constitution. But, to suggest that just and reasonable rates can only be obtained in a single one-step process or by traditional ratemaking methodology ignores the breadth of authority granted the IURC un-

der the Constitution and § 113 to tailor its order to the exigencies of the case. A litigant has no right to insist that a commission not take a second step in a rate-making process without first retracing all previous ones. *Interstate Commerce Comm'n v. Jersey City*, 322 U.S. at 517, 64 S.Ct. at 1136. Neither does the Constitution

> bind rate-making bodies to the service of any single formula or combination of formulas. Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority to make the pragmatic adjustments which may be called for by particular circumstances.

*Federal Power Commission v. Natural Gas Pipeline Co.* (1942), 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037. *See also Federal Power Commission v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 620, 64 S.Ct. 281; 296, 88 L.Ed. 333 (validity of rate order determined by result reached, not method employed; if total effect of rate order cannot be said to be unjust and unreasonable, judicial inquiry at end.) In interpreting our own regulatory legislation, Indiana courts have repeatedly refused to force the IURC to reach its conclusion by a different approach than the one it used or to require it to adopt a standard analytical process in all cases. *Office of the Utility Consumer Counselor v. Public Service Co.* (1984), Ind.App., 463 N.E.2d 498, *trans. denied.* Questions of ratemaking methodology have been routinely left to the IURC's judgment, provided the choice of methodology is based upon a consideration of all relevant factors and is reasonably related to the discharge of the IURC's statutory duty, i.e. that the IURC committed no clear error in judgment and its actions are founded upon a reasonable basis of support in the record. *L.S. Ayres*, 351 N.E.2d at 830.

---

**10.** CAC also contends that the IURC exceeded its authority when it vacated the permanent rate hearing dates it had previously set without holding a hearing on its decision to modify its February 3, 1988 orders. However, as we have discussed above, those orders made any subsequent permanent ratemaking proceedings conditional upon a determination that PSI had re-

covered completely as contemplated and detailed in the 1986 order. The IURC therefore did not "amend, alter or rescind" a previous order, *see* I.C. 8-1-2-72; it followed the procedure originally intended should it determine that PSI's circumstances warranted continued emergency treatment.

■ We cannot discern any error in the IURC's decision to continue to evaluate PSI's circumstances by nontraditional methods.[11] The IURC found that a "mechanistic focus" on coverage levels and other ratios would ignore these qualitative aspects of PSI's financial condition which were so critical to its complete recovery. The evidence before the IURC and its findings reflect: (1) that an outright rate reduction without the proposed restructuring of PSI's balance sheet would result in a decline in earnings per share; (2) that PSI had not yet reached a financial condition which would allow it access to the capital markets under reasonable terms; (3) that PSI still did not have a balanced capital structure; indeed, its capitalization was characterized as thin and unable to withstand adverse developments and downward financial pressures; and, (4) that because of the financial disaster it had withstood, the utility needed a stronger demonstration of safety sustained over time to rebuild investor confidence. These are all valid considerations in setting just and reasonable rates. *See Hope Natural Gas Co.,* 320 U.S. at 603, 64 S.Ct. at 288 (Return to equity owner should be sufficient to assure confidence in financial integrity of enterprise, to maintain credit and attract capital).

As CAC contends, the phased, rate reduction adopted by the IURC was not the sole rate scenario offered which was portrayed as consistent with full utilization of the regulatory asset, although the question of whether full utilization of the regulatory asset and an outright rate reduction could both be accomplished was subject to considerable disagreement and ultimately resolved adversely to CAC. But the IURC is not required by the Constitution or Indiana's Public Service Act to adopt as just and reasonable any particular rate level; any rate selected by the IURC which is within a "zone of reasonableness," including a rate higher than a confiscatory rate must be affirmed by this court. *In Re Permian Basin Area Rate Cases* (1968), 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312; *Natural Gas Pipeline Co.,* 315 U.S. at 585, 62 S.Ct. at 742. Furthermore, full utilization of the regulatory asset was not the sole objective of the IURC in setting emergency rates for PSI in 1986 nor was it the only justification offered by the IURC in its 1988 findings for rejecting CAC's call for a return to traditional ratemaking principles when it adjusted PSI's rates.

■ PSI's proposal of accelerating the refund of deferred taxes was the *only* vehicle offered by any of the parties which was both consistent with the goals of the 1986 recovery plan and a reduction in rates. The record shows and the IURC found that all parties were in agreement that a rate adjustment was in order. Since the IURC was willing to grant a reduction only if it could be accomplished without destroying the progress made or intended for PSI, a balance of interests which we find to be reasonable, the question remaining was the extent of the refund which could still be made and not damage PSI's recovery. The IURC adopted the maximum rate reduction supported by the evidence which would meet the criteria established in 1986 for PSI's recovery.[12] Under these circumstances, we must conclude that the modification made in rates was just and reasonable as contemplated by § 4 of the Public Service Commission Act. Since there are no constitutional requirements more exacting than these standards, a rate order which conforms to the latter does not run afoul of the former. *Hope Natural Gas,* 320 U.S. at 607, 64 S.Ct. at 290.

■ As CAC contends, the IURC never expressly found that the adjusted rates were just and reasonable.[13] However, to

11. Although CAC argues that traditional methods should have been employed, it has not endeavored to show us why nontraditional methods are now deficient or unworkable.

12. CAC stood mute concerning PSI's proposal and the appropriate level of rate which could be accomplished by that methodology, choosing instead to adhere to its call for an outright rate reduction and the setting of permanent rates.

13. CAC conceded at oral argument that full and proper findings were made in the 1986 order.

remand for a specific finding to this effect would serve no useful purpose as the reasonableness of the IURC's action is apparent from the IURC's decision.

For the reasons stated, we conclude that the June 1, 1988 order of the Indiana Utility Regulatory Commission is neither contrary to law nor does it occasion a deprivation of due process.

Determination affirmed.

BAKER and BUCHANAN, JJ., concur.