## UNITED STATES v. PENNSYLVANIA R. CO.

Civ. No. 13350.

United States District Court
E. D. Pennsylvania.
June 19, 1952.

616

Gerald A. Gleeson, U. S. Atty., Philadelphia, Pa., Erwin Lodge, Sp. Asst. to U. S. Atty., Philadelphia, Pa., for plaintiff.

Francis J. Myers, Philadelphia, Pa., for defendant.

CLARY, District Judge.

This is an action by the United States for a preliminary and permanent injunction against The Pennsylvania Railroad Company to compel the railroad to reduce charges for toilet and washroom facilities in its passenger stations and terminals to prices fixed by the Director, Office of Price Stabilization. It is brought under Sections 409 and 706 of the Defense Production Act of 1950, as amended, 50 U.S.C.Appendix, §§ 2109, 2156. In addition, the Government requests a money judgment in the sum of $385,244.82, representing three times the amount charged by the defendant over the applicable ceiling prices established under General Ceiling Price Regulation, 16 F.R. 808, as amended, and Ceiling Price Regulation 34, 16 F.R. 4446, as amended. The matter is presently before the Court on defendant's motion to dismiss.

Defendant's contention is that the Defense Production Act by its terms exempts the charges here involved. The Government, on the other hand, contends that the exemption in question is limited in scope and applies only to charges made by the railroad for the actual transportation of either passengers or goods or for services performed in connection with transportation upon goods, wares, or merchandise in transit. It contends that pay toilet facilities are not an integral part of the service of common carriers and that charges made by the defendant for such facilities are not exempt from price control.

The applicable exemption which the defendant contends exempts it from the operation of the Act is Section 402(e) of the Defense Production Act of 1950, as amended, 50 U.S.C.Appendix, § 2102(e), and reads as follows:

"(e) The authority conferred by this title shall not be exercised with respect to the following:

\*  \*  \*  \*  \*  \*

"(v) Rates charged by any common carrier or other public utility \* \* \*."

An identical exemption was contained in the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq. The construction of that exemption was before the Courts on many occasions. The case probably most nearly analogous to the instant case, in principle, but not in facts, is the case of Fleming v. Railway Express Agency, Inc., 1947, 161 F.2d 659. It involved charges made by the railway agency for over-the-road motor vehicle transportation of less than carload lots and store-door pickup and delivery services at prices higher than those set by the General Maximum Price Regulation established under the 1942 Act. The Court there pointed out very forcibly that it was the intention of Congress to exempt common carriers or other public utilities because they were subject to regulation either by the Interstate Commerce Commission or state regulatory commissions. The Court remarked that it seemed clear to it that it was not the intention of Congress to give authority to two rate or price-making bodies. A review of the cases decided under that Act shows that the Courts have been uniform in broadly construing the exemption. Fleming v. Railway Express Agency, Inc., supra. In re Rice, 83 U.S.App.D.C. 26, 165 F.2d 617; Fleming v. Chicago Cartage Co., 7 Cir., 160 F.2d 992; Dunham & Reid v. Porter, Em.App., 157 F.2d 1022; Bowles v. Wieter, D.C., 65 F.Supp. 359; State of Alabama v. United States, D.C., 56 F.Supp.

478 (reversed on other grounds) 325 U.S. 535, 65 S.Ct. 1274, 89 L.Ed. 1779.

In Alabama v. United States, supra, the Price Administrator under the Emergency Price Control Act attempted to have set aside and declared void an order of the Interstate Commerce Commission fixing intrastate rates. The Court held that by the provision of the 1942 Act providing (as does the present Act) that in any general increase in rates or charges, the carrier or utility must give notice to the President or such Agency as he may designate, Congress did not intend in any way to limit the existing power of the Interstate Commerce Commission over that field or to give the Price Administrator any standing to make mandatory demands upon it or to take from it any part of its existing discretion, citing Vinson v. Washington Gas Light Company, 321 U.S. 489, 64 S.Ct. 731, 88 L.Ed. 883; Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420. As noted, the case was reversed in the Supreme Court because of lack of sufficient evidence to support the finding involved, but no question was raised as to the absolute power of the Interstate Commerce Commission.

In the case of Dunham & Reid v. Porter, supra, Chief Judge Maris of the Emergency Court of Appeals construed the exemption provisions as not being limited to common carriers whose rates are regulated by other federal or state authorities.

In re Rice, supra, held that where a statute constituted a business of common carrier, it was not subject to the provisions of the Emergency Price Control Act. That case involved rentals charged for the use of taxicabs by an owner who rented taxicabs to others for operation in the District of Columbia. He performed no services himself. The Court held that though the rentals charged were not actually controlled by the Public Utilities Commission, the exemption governed.

Mr. Justice Jackson in Davies Warehouse Co. v. Bowles, 321 U.S. 144, 150, 151, 152, 64 S.Ct. 474, 88 L.Ed. 635, also involving the exemption, precisely stated the problem involved in this case. He said that Congress may well have desired to avoid conflict or occasions for conflict between federal agencies and state authority which are detrimental to good administration and to public acceptance of an emergency system of price control that might flounder if friction with public authorities be added to the difficulties of bringing private self-interest under control. Further, that where Congress has not clearly indicated a purpose to precipitate conflict, the Courts should be reluctant to do so by decision.

Congress in including the exemption of "rates charged by any common carrier or other public utility" in the Defense Production Act of 1950 did so in light of existing law. The Amendment of June 18, 1910, 36 Stat. 545, c. 309, to the Interstate Commerce Act provided that "all charges made for any service rendered or to be rendered in the transportation of passengers or property * * *, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful". 49 U.S.C. § 1, par. (5). The duty of determining just and reasonable charges, since that Amendment, has reposed exclusively in the Interstate Commerce Commission. The reasons for the delegation of the powers of Congress over interstate carriers to the Commission become abundantly apparent from the historical analysis of the Interstate Commerce Commission Act by Chief Justice Taft in the case of Railroad Commission of Wisconsin v. Chicago, B. & Q. Railroad Company, 257 U.S. 563–582, 42 S.Ct. 232, 66 L.Ed. 371. The Chief Justice pointed out that the original purpose of the Act, passed in 1887, was to prevent carriers from charging unreasonable rates and from unjustly discriminating between persons and localities. Various amendments including the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 589, and the Amendment of June 18, 1910, 36 Stat. 539, c. 309, made the authority of the Commission to fix rates and in dealing with carriers summary and effectively complete. He pointed out the difficulties confronting the railroads between 1910 and 1917 because of the difficulty of securing investment capital. The World War I extraordinary demands for

transportation forced Congress and the President to take over the operation of the railroads. From January 1, 1918 to March 1, 1920, the railroads were operated by the United States. Because of the rapid rise in labor and material costs in the intervening time, the operators of the railroads requested assistance from the Government before taking the railroads back under private management. After elaborate investigations by the Interstate Commerce Committees of both Houses, Congress acquiesced in the view of management and passed the Transportation Act of 1920. This Act constituted a radical departure in the viewpoint of Congressional regulation of railroads. Prior acts were designed primarily to prevent injustice by unreasonable or discriminatory rates against persons and localities. The only protection afforded the carriers was the requirement that rates fixed should be reasonable in the sense of furnishing adequate compensation for services rendered and the abolition of rebates. The new measure, on the contrary, imposed an affirmative duty upon the Interstate Commerce Commission to provide adequate railway service for the people of the United States. Under the powers conferred by this Act the Commission was authorized to require operation of facilities including terminals, even at a loss if those facilities were necessary in the overall requirement of an adequate railway service for the people of the United States. All phases of railway activity thus have come under the scrutiny of the Commission.

The Supreme Court of Florida in the case of State of Florida ex rel. Burr v. Seaboard Air Line Railway Company, 89 Fla. 419, 104 So. 602, 604, 39 A.L.R. 1362, in reviewing the Interstate Commerce Act clearly stated the purpose of The Transportation Act of 1920 in the following language:

"The Interstate Commerce Act (U. S.Comp.St. § 8563 et seq. [49 U.S.C.A. § 1 et seq.]) was passed for the purpose of regulating commerce throughout the nation, and, as amended by the Transportation Act of 1920, for purposes of interstate commerce placed

the transportation system of the country completely under the supervisory control of the Interstate Commerce Commission. Under this act the dictum of the Commission is the last word in such matters as through route and rate regulation, just division of joint rates, car and terminal service in the interchange of interstate freight and passengers between railroads, construction of new and extension of old lines, purchasing of equipment, safety devices, issuance of securities, safety and adequate facilities, and such others as tend to prompt and continuous service in interstate commerce."

Numerous cases of the Supreme Court, including the case of Board of Trade v. United States, 314 U.S. 534–546, 62 S.Ct. 366, 372, 86 L.Ed. 432, have recognized the plenary powers of the Interstate Commerce Commission over common carriers. In the Board of Trade v. United States case, supra, Mr. Justice Frankfurter comments rather fully upon the duties of the Interstate Commerce Commission and remarks that the process of rate-making is essentially empiric, and further:

"The stuff of the process is fluid and changing—the resultant of factors that must be valued as well as weighed."

He further makes this significant observation:

"Congress has therefore delegated the enforcement of transportation policy to a permanent expert body and has charged it with the duty of being responsive to the dynamic character of transportation problems. Cf. Railroad Commission v. Rowan & Nichols Oil Co., 310 U.S. 573, 581, 582, 60 S.Ct. 1021, 1024, 84 L.Ed. 1368."

The Commission in the fulfillment of its obligations of supervision of the railroads has set up certain accounting procedures which must be followed by all railroads. It designates in its classification of accounts the property which it conceives to be held for common carrier use. Uniformly the Commission has held "stations" to be common carrier property.

Title 49 C.F.R., Sec. 10.227 (1949 Edition) provides that repairs to stations and office building shall be part of the expense account of the operating carrier. Listed as one of the items included within this definition are "washrooms". Under the same Regulation, Sec. 10.143, revenue from washrooms would be included under operating revenue. It is clearly evident, therefore, that in the view of the Interstate Commerce Commission and its accounting procedures, operation of stations including washrooms, and the income and expense thereof are part of the operations of the railroad in its true sense as a common carrier.

The Government in this case has argued that washrooms, even though operated by the railroad, should come under the same classification as newsstands, restaurants, haberdasheries, gift shops and the other myriad activities operated by private individuals in and around station property which are admittedly a convenience to the travelling public. This ignores the realities of the situation since these types of enterprises are operated by private individuals or corporations for individual profit and have no connection with the duties and functions of the railroads. The Interstate Commerce Commission, on the other hand, has held in one instance a restaurant operated by a railroad which, although open to the public, was used almost exclusively by passengers and employees of the railroad, and which was necessary for carrier purposes, to be a common carrier facility. Valuation Docket No. 828, Missouri, Kansas & Texas Railway Company et al., 34 Val.Rep. 293.

A review of many cases contained in the Valuation Reports of the Interstate Commerce Commission does not sustain the contention of the Government that either the operation or the manner of operation of the facilities involved in the instant case in any way destroy the apparent classification under Commission Rules as common carrier property used for common carrier purposes.

■ We are dealing here with a situation which is an integral and necessary part of station and terminal facilities for the use of passengers of the railroad in its capacity as a common carrier. Passengers and prospective passengers are business invitees of the railroad the moment they step upon railroad property. 13 C.J.S., Carriers, § 645, defines the rights of the passengers and the duties of the carrier in that regard.

"The duties of a carrier require that it should furnish reasonable stational facilities for the accommodation of travellers on its lines, and it is the duty of a railroad company to maintain a waiting room for the comfort of passengers at junctions or intermediate points, and to allow passengers the use of it for a reasonable length of time before and after the arrival and departure of trains."

■ That washrooms and toilet facilities are a necessary and integral part of such facilities cannot be successfully contested. Railroads for over one hundred years have recognized their duty in this regard. The fact that the Interstate Commerce Commission has permitted local authorities, state and municipal, to regulate sanitary conveniences in station and terminal facilities is not in derogation of the powers conferred upon the Interstate Commerce Commission by Congress as affecting common carriers. The Interstate Commerce Commission has recognized in express language that it has powers which for purposes of expediency or practicality it does not choose to exercise. In the case of Stopher v. Cincinnati Union Terminal Co., 246 I.C.C. 41–46, is found the following language:

"Railroads render various minor services, such as furnishing rate and ticket information, for which no direct charge is made, and in such instances it is obvious that situations are unlikely to arise with respect to them which require the exercise of our jurisdiction."

It requires little imagination to realize that local authorities are in a much better position to supervise the installation and use of sanitary facilities affecting public health than would be a federal agency such

620

as the Interstate Commerce Commission. As a matter of practicality in nearly every State of the United States, the State itself delegates the duty of such supervision to the local municipal authority. In neither case can such delegation be said to be in anywise a limitation of powers as is suggested by the Government in its brief in this case.

The Office of Price Stabilization, a temporary agency, is here attempting to bring within the purview of its powers, functions heretofore entrusted to a permanent agency charged by Congress with special duties requiring expert knowledge and delicate administrative judgment. That Congress by giving a broad exemption to public utilities and common carriers did not intend this result is evident from the exemption contained in Section 406 of the Defense Production Act, 50 U.S.C., Appendix, § 2106, which provides:

> "Nothing in this title shall be construed to require any person to sell any material or service, or to perform personal services."

This privilege of selling or refusing to sell, performing or refusing to perform, is clearly applicable to private business generally, but is not applicable to a common carrier which must act solely through the regulatory body, the Interstate Commerce Commission, and may not suspend services of any kind without the Commission's permission. Nor do the provisions of Section 402(b) (2), (c), 50 U.S.C., Appendix, § 2102, which provide for fair and equitable charges under the Defense Production Act, sustain the position of the Office of Price Stabilization. The construction contended for by the Director, Office of Price Stabilization, would give to him powers which overlap with those of the Interstate Commerce Commission in the regulation of common carriers. Such an incongruous situation with division of authority and resultant confusion between a permanent, technical agency and a temporary, emergency agency was certainly never intended by the Congress of the United States.

I hold, therefore, that the exemption contained in Section 402(e) of the Defense Production Act of 1950 is applicable to the charges involved in this case; that the Director, Office of Price Stabilization, is without authority to fix by any general or special ceiling price regulation charges made by a common carrier for toilet and washroom facilities; that the motion of the defendant must be granted.

An Order will be entered dismissing the Complaint.