UNITED STATES
v.
ST. PAUL UNION DEPOT CO.
Civ. No. 2402.

United States District Court
D. Minnesota, Third Division.
Feb. 9, 1954.

George E. MacKinnon, U. S. Atty., and Alex Dim, Asst. U. S. Atty., St. Paul, Minn., for plaintiff.

M. J. Galvin, St. Paul, Minn., for defendant.

DONOVAN, District Judge.

There is very little dispute about the facts in the case. Defendant is a common carrier owned by the common carrier railroads operating in and out of defendant's Union Depot, in the City of St. Paul. In that connection defendant owns and rents to employees of itself, parent railroads, the government, and to the general public, indoor and outdoor garage and parking space. Patrons of defendant's parking system are required to enter into a uniform contract of leasing, formally executed by defendant as lessor and the patron as lessee.[1] Said employees and the general public occupied parking space subject to the same rules, regulations and rights of occupancy in connection therewith.

Defendant, at a meeting of its Board of Directors on February 18, 1952 (and without benefit or approval of plaintiff), raised the rates, effective April 1, 1952,[2] and all lessees were notified of such action by notice dated February 19, 1953.[3] Defendant also issued to all lessees what it termed "Schedule of Auto Parking

1. The lease among other things provided:
"The Saint Paul Union Depot Company, hereinafter called the 'Depot Company', hereby leases to —————— hereinafter called the 'Lessee', the use of parking space located on property of the Depot Company adjacent to and in its terminal station building at St. Paul, Minnesota, for the term of one —————— from and after the date hereof, to be used by said Lessee for the parking of Lessee's automobile within said space, in consideration of the payments of the rental provided for in Schedule '———' hereto attached and made a part hereof.

"It Is Agreed that this Agreement with all its provisions and covenants shall continue in force from month to month; provided, however, that either party hereto may terminate the same at any time by mailing the other party thirty (30) days' notice.

\* \* \* \* \*

"Said Lessee hereby further agrees to indemnify and hold harmless the Depot Company and each of its tenant companies from any claim or demand on account of the liability herein by him assumed.

"The Lessee agrees to abide by such rules as may be established from time to time by the Depot Company covering the use of said parking space.

"The Lessee agrees that it will not assign this agreement without the written consent of the Depot Company."

2. Plaintiff's Exhibit 3 recites what transpired, as follows:
"The question as to the rentals collected for parking automobiles on depot property, was given consideration, and upon motion duly made, seconded and unanimously passed, it was agreed to increase the present rates of $7.50 per month in the Sibley Street garage, $5.50 per month inside underneath the Track Structure, $4.50 per month outside underneath the Track Structure, and dead storage rate of $4.00 per month, to $10.00 per month for the Sibley Street garage, $7.50 per month for space underneath Track Structure, inside and outside, and $5.00 per month for dead storage, effective April 1, 1952. Notice to be served on all parkers 30 days in advance and that parkers who have already paid in advance would not be affected by the increase until the period for which they have paid terminates."

3. The notice reads:
"All Concerned:—
"The Board of Directors of The Saint Paul Union Depot Company at special meeting February 18, 1952, passed a resolution requesting an increase in rental for parking spaces on this property.
"Sibley Street Garage—all parking $10.00 per car per month.

Rates." [4]  The matter having been subsequently called to the attention of the government, correspondence followed between counsel representing the respective parties.[5]

■■ Government counsel contend that the parking facilities offered and furnished by defendant to its patrons constitute "service" or "services" within Ceiling Price Regulation 34, § 27(17) issued under the provisions of the Defense Production Act of 1950, as amended, rather than a lease of real property.[6]

Counsel for defendant contends (1) that it was renting real estate and not a service, and (2) that what it did and is doing was and is part of its common carrier functions and hence wholly within the exempting provisions of the Defense Production Act, i. e., § 402(e), thereof as amended by 50 U.S.C.A.Appendix, § 2102(e) and (v).[7]

The first issue presented by the evidence and arguments of respective parties may be stated thus: Whether the rental of the parking spaces was the rental of real estate as distinct from the rental of a service.

The plaintiff in this connection relies on the decision rendered in Carothers v. Bowles, Em.App., 148 F.2d 554, certiorari denied 325 U.S. 875, 65 S.Ct. 1556, 89 L.Ed. 1993. The Court in that case, dealing with the so-called "park and lock" type of parking in deciding that the defendant was renting a "storage service", not just renting space, put particular stress on the following incidents: marking off of suitable spaces, lighting, cleaning and keeping the garage in suitable condition, and providing a common entrance. The Court, while conceding that one who merely rents a piece of ground to the owner of an automobile in order that the latter may store his car upon it, without more, is not engaged in rendering a service within the meaning of the Act, determined that the incidents above referred to were sufficient to constitute the rental of a service, rather than the rental of real estate.

The instant case is distinguishable in at least one important feature, and that is that each renter entered into a term lease with the defendant (see marginal note 1, supra), whereas in the Carothers case, 148 F.2d 554, supra, it would appear there was no such lease, but rather that each renter paid by the day.[8]

Defendant in support of its lease theory has cited to the Court Minnesota decisions which it believes are deter-

---

4. Among many instructions was this:
   "Lock your car doors while your car is parked on our property, But leave shift lever in neutral, with brakes off (unless space is not level), so it can be moved in case of emergency."

5. Plaintiff's Exhibit 5 indicates defendant wrote to plaintiff on March 31, 1952, advising of its stand, and citing: United States v. Pennsylvania R. Co., D.C., 105 F.Supp. 615; Dennis v. Coleman's Parking & Greasing Stations, Inc., 211 Minn. 597, 2 N.W.2d 33.
   Plaintiff in response cited: Carothers v. Bowles, Em.App., 148 F.2d 554.

6. The pertinent part of this Regulation is as follows:
   "(17) 'Service' or 'services' means any act or acts performed or rendered, other-

wise than as an employee, for a fee, charge or other consideration. The term includes any privilege sold or granted, or any forbearance to act, for a fee, charge or other consideration. The term also includes the rental of any commodity or service if the rental charge is not covered by another ceiling price regulation and has not been exempted from price control."

7. "(e) The authority conferred by this title shall not be exercised with respect to the following:
   * * * * *
   "(v) (1) Rates and charges by any common carrier or other public utility * * *; charges for the use of parking facilities operated by common carriers in connection with their common carrier operations".

8. Likewise distinguishable for the same reason enunciated above is the case of Carothers v. United States, 5 Cir., 161 F.2d 718.

All other spaces on Depot property— $7.50 per month.
Dead Storage—$5.00 per month.
"These new parking rental rates to be effective April 1, 1952."

minative of this point.[9]  It is not necessary to comment on these citations at length.

Suffice it to say that it is this Court's determination that the evidence shows the rental herein involved was a lease, not a bailment, and that any incidental services provided are not sufficient to constitute a rental of a service, rather than of real estate.  The rental herein is thus not within the purview of the Act.[10]

■  While the foregoing reasoning is determinative of the issues herein involved, cursory discussion by way of dictum may be given to the second contention of the parties, i. e., that the rental in issue is a function of the common carrier, and thus specifically exempt from the Act.  As to this issue, the plaintiff relies on the specific exemption provided for in the Act (marginal note 7, supra) and argues that the case of United States v. Pennsylvania R. Co., D.C.Pa., 105 F.Supp. 615, is factually distinguishable from the instant case. Resort to the reasoning of the Court in the last-cited case discloses that while it is limited to facilities which are an "integral part of the railroad", yet the Court significantly emphasizes that where a common carrier or public utility is subject to regulation either by the Interstate Commerce Commission or state regulatory commission, it would be exempt from the provisions of the Act because otherwise an incongruous situation would prevail with division of authority and resultant confusion between a permanent, technical agency and a temporary emergency agency, 105 F.Supp. at page 620.

It is true that Congress amended the provisions of the Act to specifically exempt toilet facilities and parking facilities operated by common carriers in connection with their common carrier operations (see marginal note 7, supra), and thus plaintiff seeks to now claim that the parking space here in question is not within such specific exemption.  The evidence, however, reveals that the revenue derived from these rentals went into the general operating fund to be used for the ordinary purposes of operating the station or depot and that reports submitted to the Interstate Commerce Commission included this revenue.  On that evidence it would seem clear that even though the rentals were in themselves not directly derived from or as a result of passenger or cargo operations, they were derived as a result of the general operations of the common carrier depot and to some extent at least, subject to supervision by the Interstate Commerce Commission.

Certainly, as the courts have pointed out, it could not have been the intention of Congress to have two different governmental agencies regulating and supervising the duties and operations of a subject common carrier.  Thus, despite what would seem to be a specific exemption only in the statute, it must follow that the rentals herein involved were and are part of the common carrier functions, and not within the purview of the Act.

Defendant may submit findings of fact, conclusions of law, order for and form of judgment consistent with the foregoing.

Plaintiff may have an exception.

---

9.  "The relation of landlord and tenant exists where one person occupies the premises of another in subordination to that other's title and with his consent."  See § 5361, Dunnell's Minnesota Digest (3rd Ed.) and cases cited.

10.  The cited incidental services are no more than those provided to the tenant generally of any rented area such as an apartment or an office building.  The evidence further shows conclusively that no attendant was on duty, but that in fact each renter had to open and shut the entrance door to the parking area.