VINSON, DIRECTOR OF ECONOMIC STABILIZATION, ET AL. v. WASHINGTON GAS LIGHT CO. ET AL.

No. 396. Argued February 11, 14, 1944.—Decided March 27, 1944.

*Mr. Paul A. Freund,* with whom *Solicitor General Fahy* and *Messrs. Richard H. Field* and *Harry R. Booth* were on the brief, for petitioners.

*Mr. Stoddard M. Stevens, Jr.,* with whom *Messrs. E. Barrett Prettyman, C. Oscar Berry,* and *John C. Bruton* were on the brief, for the Washington Gas Light Co.; and ·*Mr. Richmond B. Keech,* with whom *Messrs. Vernon E. West* and *Lloyd B. Harrison* were on the brief, for the Public Utilities Commission of the District of Columbia,—respondents.

*Mr. John H. Connaughton* filed a brief on behalf of the Federation of Citizens' Associations, as *amicus curiae,* urging affirmance.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

Certiorari was granted in this case, at the instance of the Director of Economic Stablization and the Administrator, Office of Price Administration, of the United States, to review a rate order of the Public Utilities Commission of the District of Columbia. The application and effect of the Emergency Price Control Act of 1942,[1] and the Act of October 2, 1942,[2] are involved.

The petitioners, who were intervenors before the Commission, appealed from its order to the District Court of the District of Columbia, which set aside the order as arbitrary and illegal.[3] The Court of Appeals for the District of Columbia reversed the District Court.[4] Understanding of the questions presented requires a detailed statement of their historical background.

The Commission was created, and its powers and duties defined, by Act of Congress in 1913, supplemented in 1926, 1935, and 1939.[5] References will be to the District of Columbia Code, 1940 edition. The statutes require public utilities within the District to furnish safe and adequate facilities, just and reasonable service, at reasonable, just and nondiscriminatory rates, and to obey the lawful orders of the Commission (§ 43–301). There are detailed provisions respecting rates and depreciation (§ 43–315). For the purpose of its functions, the Commission is directed to value "the property of every public utility within the District of Columbia actually used and useful for the convenience of the public at the fair value thereof at the time of said valuation." (§ 43–306.) Nothing in the statute is to

---

[1] 56 Stat. 23.

[2] 56 Stat. 765.

[3] 48 F. Supp. 703.

[4] 137 F. 2d 547.

[5] c. 150, 37 Stat. 974; c. 8, 44 Stat. 920; c. 742, 49 Stat. 882; c. 40, 53 Stat. 569. D. C. Code, 1940 Ed., Tit. 43 §§ 101–1006.

be "taken to prohibit a public utility, with the consent of the Commission, from providing a sliding scale of rates and dividends according to what is commonly known as the Boston sliding scale, or other financial device that may be practicable and advantageous to the parties interested." But no such arrangement is lawful until found by the Commission, after investigation, to be reasonable, just, and not inconsistent with the purposes of the Act. Such arrangement must operate under the supervision and regulation of the Commission, may be altered and amended, and may be terminated by the Commission (§ 43–317). Usual powers to fix rates, charges, and make rules and regulations are conferred (§ 43–411). The Commission may make rules and regulations to govern its proceedings and to regulate the mode and manner of investigations and hearings before it (§ 43–402). Appeal from its orders is authorized, and the scope of review defined (§§ 43–705 to 43–706).

Pursuant to its authority, the Commission initiated in 1931 and concluded in 1935 a proceeding for the valuation of the property of the Washington Gas Light Company, at an expense of some $750,000, and arrived at a depreciated rate base as of 1932. It then entered upon a further inquiry as to rates. After this had lasted some time it approved and adopted a sliding scale arrangement, which involved a rate base, to be adjusted annually by adding net property additions at cost, a rate of return, and a rate of accrual to retirement reserve, in the light of which the rates of the company were to be adjusted annually. It found that the plan was practical and would be advantageous to all parties interested. This plan calls for an annual determination of the rate of return earned during the "test year," and of the amount available for rate increase or decrease for the succeeding "rate year," and schedules and regulations to accomplish such increase or decrease. Such determination is to be made after public

notice and opportunity for hearing. The plan defines a rate year as "the twelve months' period from September 1st to August 31st, inclusive," and the test year as "the twelve months' period ending . . . June 30th preceding the rate year." At the inception of the plan, rates were reduced by some $800,000 annually, and subsequent annual hearings and determinations resulted in rate reductions in each year after 1935, except in 1937 and 1941, when no changes were made.

The duration of the system was not prescribed but in its order the Commission stated that it construed the statute to permit a termination upon reasonable notice, and found that ninety days' written notice of termination by Commission or Company would be reasonable.

March 20, 1942, the Commission issued its order of investigation in conformity with the sliding scale arrangement. After preliminary investigation by its agents and the representatives of the company, the Commission, pursuant to statutory requirement, issued, on July 21, 1942, notice of hearing as to rates, charges, and regulations which were to become effective September 1, 1942, in accordance with the sliding-scale arrangement. The Price Administrator was given leave to intervene and was represented at a prehearing conference and at all hearings, and his counsel was permitted to cross-examine witnesses and to offer testimony. These began August 18 and continued on August 19, September 4, 8, 11, and 14, and closed on the last-named date. The Commission stated that it would welcome testimony with relation to the aims and purposes of the Office of Price Administration during the national emergency and the relation of those aims and purposes to the proceedings, and expressed the hope that the Administrator, as intervenor, would develop testimony along lines which would enable the Commission to determine whether an increase should be granted in view

of the national emergency. The Administrator's counsel offered evidence, cross-examined witnesses, argued and filed a brief.

On application of other parties, the proceedings were reopened and further hearing had September 30th. Counsel for the Administrator participated and filed a second brief. The hearings were again closed, and, October 13, the Commission issued its findings, opinion and order.

The petitioners' standing in the proceedings deserves notice. Section 302 (c) of the Emergency Price Control Act of 1942 [6] provides: "Nothing in this Act shall be construed to authorize the regulation of . . . rates charged by any common carrier or other public utility." [7] The admission of the Administrator as intervenor was, therefore, not pursuant to statute but was governed by the Commission's rules. The Commission had provided for intervention in its rules. Rule 7.3 is: "The Commission may grant or deny a petition for leave to intervene, or may grant the petition upon such conditions and limitations as it may prescribe." Rule 7.5 is: "The granting of a petition to intervene shall not have the effect of changing or enlarging the issues in the proceeding, except where such change or enlargement is expressly requested in the petition and is expressly granted by the Commission after opportunity for hearing upon the question has been afforded all other parties."

After final submission, and before promulgation of the Commission's order, the Emergency Price Control Act was amended by the Act of October 2, 1942, which, while prohibiting the President from suspending that portion of the original Act exempting public utilities from the scope of the statute, provided: "That no common carrier or other

---

[6] 56 Stat. 36, 50 U. S. C. § 942 (c).

[7] Compare *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144.

public utility shall make any general increase in its rates or charges which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the federal, state, or municipal authority having jurisdiction to consider such increase." 50 U. S. C., Supp. III, § 961.

On the showing of the Commission's staff, the company would have been entitled, under the sliding scale, to an increase in rates of $324,718. The increase approved by the Commission was $201,424, effective September 1, 1942. In its order, however, the Commission directed the company's attention to the provisions of the Act of October 2, 1942, and quoted its language. Accordingly the company, October 14, 1942, served notice upon the Director of Economic Stabilization, who had been designated for the purpose by the President, of the proposed increase in rates together with a copy of the Commission's order, and later consented to his intervention. The court below has found that the requisite notice and consent to intervention was given by the company in accordance with the Act.

Counsel who had participated in all the prior proceedings for the Administrator filed with the Commission October 19 a petition in the name of the Administrator, and on behalf of the Director, asking that the Commission vacate its order and reopen the proceedings to allow the Director to intervene. The Commission reopened the proceeding and set a hearing for November 2 "for the purpose of receiving from the Office of Price Administration, on behalf of the Director of Economic Stabilization, additional evidence relating to the inflationary effect, if any, of the increase in rates authorized by Order No. 2401, and intervention is granted for such purpose." When the reopened proceedings came on for hearing, the same counsel who had theretofore participated in behalf of the Administrator appeared before the Commission, offered no

witnesses, but renewed a motion previously filed that the proceeding be reopened "without restriction as to the type of evidence to be presented" and that the Commission vacate its order. The motion was denied, the Commission announcing that it was ready to receive evidence in accordance with the order reopening the proceeding. The petitioners offered no evidence. On being asked whether they had any testimony to present in accordance with the order to reopen the proceedings, they asked for a continuance so that they might consult their associates. The request was granted. On November 4, counsel recalled a witness for further examination but offered no other evidence. The proceedings were then closed for the third time without the offer of any testimony relating to the national economic policy developed under the Emergency Price Control Act as amended "and the effect thereon of increase in rates or charges of common carriers or other public utilities."

The Commission reconsidered the record and the testimony and, November 9, issued its order in which it reviewed the proceedings and found that the evidence adduced failed to show that the rates authorized by order No. 2401 were unduly inflationary. It denied the Director's petition to vacate the order. Thereafter the company put the new rates into effect as of November 16th. On appeal by the petitioners, the District Court held that the action of the Commission, in the light of the record, was arbitrary and illegal, and vacated the order. The Court of Appeals reversed, holding that the Commission had afforded petitioners full opportunity for a hearing upon any question which, under the law and the rules of the Commission, was open in the proceeding and that it was not arbitrary or illegal for the Commission, on the record made, to deny the abandonment of the sliding-scale plan and the prosecution of an entirely new rate investigation involving fair value, depreciation, rate of return,

and other elements commonly considered in such an investigation.

The petitioners seek vacation of the order on the ground that the Commission denied them a full and fair hearing. This contention is based upon the substantive contention that under the Acts of January 30 and October 2, 1942, they were entitled to demand that the Commission enlarge the scope of the hearing and convert the inquiry into one whether an increase of rates was necessary to the company to prevent hardship. The Commission, on the other hand, insists that it was entitled to conduct the proceedings in accordance with its statutory powers as they existed prior to 1942, and, at most, accord the petitioners a full hearing as to the effect of any order in its relation to inflation in the war emergency. Thus it appears that the controversy is essentially one between two governmental agencies as to whether the powers of the one or the other are preponderant in the circumstances.

In view of the petitioners' insistence that they were entitled, in effect, to control and direct the inquiry without regard to the statutory powers of the Commission, we shall first examine the extent of the authority conferred upon petitioners by Congress.

The Emergency Price Control Act of 1942, while it gives the Administrator power over prices of "commodities," which are not generally regulated by public authority, specifically and expressly withholds from the Administrator jurisdiction over public utility rates. And, as we have noted, the Stabilization Act of October 2, 1942, did not alter this prohibition but required merely that no utility should generally increase rates in effect September 15, 1942, unless it first gave thirty days' notice to the President or his representative and consented to the timely intervention of that representative before the federal, state, or municipal authority having jurisdiction to consider the increase.

It is not clear that this language confers a right of intervention. The bill as passed by the Senate contained a provision that there should be no increase in utility rates unless they were approved by the President. The House refused to concur, with the result that only the language now contained in the proviso appeared in the bill. The assertion that, while the Price Administrator or the Director may present his views to the regulatory body, "he had nothing to say about its decision," was made and not contradicted on the Senate floor in discussion of the conference report. Evidently Congress intended to grant the Administrator plenary control over commodity prices, since they generally were not the subject of local regulation, but in both the original Act and the amendment, as this Court has recently said in *Davies Warehouse Co.* v. *Bowles, supra,* was careful "to avoid paralyzing or extinguishing local institutions." Thus it limited the right of the Executive to notice by the utility and the utility's consent that the Executive might be heard by the regulatory body having final authority in the premises.

If the petitioners were admitted as intervenors by a state commission, or by the District Commission, which is a respondent here, they might, of course, be admitted to participation in the proceeding upon reasonable terms; and one of the most usual procedural rules is that an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding. To this effect was the Commission's rule on the subject. It would seem then that, in the absence of clear legislative mandate to the contrary, the petitioners should not possess greater rights than other intervenors.

This the petitioners deny. They say that, notwithstanding the absence of any categorical enactment, the general purpose of the original Act and its supplement

show that Congress intended to prohibit state and local regulatory authorities from permitting any increase in utility rates which was not shown to be necessary to prevent actual hardship. We are asked then, not only to revise the views expressed in *Davies Warehouse Co. v. Bowles, supra,* as to the scope of the Acts, but to infer from a general expression of congressional policy, the limitation of existing powers conferred by law on regulatory commissions throughout the nation, both state and federal, and the endowment of a different federal agency with new and superior rights and powers.[8] This we are unable to do.

The other contention of the petitioners stems from their view as to the effect of the Emergency Price Control Act and the Stabilization Act. They insisted below that they were denied a fair hearing because the Commission refused, in the current proceeding, to alter and enlarge the scope and the character of the inquiry. It will be remembered that, under the Commission's existing order, a termination of the sliding scale arrangement required ninety days' written notice. There was no application of any rate payer or any purpose of the Commission in the spring of 1942 to abrogate the arrangement. On the contrary, the Commission gave the required notice for the usual annual adjustment under the plan; and, after the necessary investigations by its agents, gave notice of hearing with respect to such adjustment. At that point, and at a time when no notice of increase of rates was required by any Act of Congress, the Administrator, upon his application was permitted to intervene in the proceeding.

In his petition, and at the hearings, he asserted and reiterated that he had the right to go into the propriety of the rate base, the operating expenses, including depreciation expenses, taxes, and rate of return, summarizing his

---

[8] *Davies Warehouse Co.* v. *Bowles, supra; Yonkers* v. *United States,* 320 U. S. 685.

demand as "a full and complete inquiry for the purpose of determining what are fair and reasonable rates . . ." The petitioners now insist that their desire was limited to examination of certain factors involved in the sliding scale. But the courts below did not so understand. The District Court, which sustained the appeal, said: "The Commission was requested to reconsider the basic principle of the sliding-scale arrangement . . ." The Court of Appeals said "the Price Administrator departed from the field committed to his care and demanded that the Commission suspend the application of the sliding scale, and reexamine its basis in a complete investigation of all the elements that enter into the determination of a utility rate by a regulatory body." These characterizations of the Administrator's contentions before the Commission are supported by the record.

If we consider the petitioners' present position we find that the Commission heard all evidence offered, and says it weighed it. The Administrator urged that the straight-line method of depreciation embodied in the sinking fund plan must be discarded in favor of a sinking fund method under the force of decisions of this Court, a position unsupported by our cases, and evidence was offered to show the result which would ensue the substitution. Some testimony was adduced as to rate of return, and the Commission's report shows this was considered. In short, if the inquiry was limited to the issues comprehended in the Commission's order of investigation, the petitioners were afforded every opportunity for a full hearing. On the subject respecting which the petitioners were especially competent to enlighten the Commission,—namely the inflationary effect of a rate increase of 2.28% for one year, amounting, on the average, to three cents per month per customer, in the light of wage increases and increased commodity prices and over-all conditions in the national

economy,—no evidence was tendered by petitioners, in response to repeated invitations by the Commission.

The judgment is

*Affirmed.*

Mr. Justice Douglas, with whom Mr. Justice Black and Mr. Justice Murphy concur, dissenting.

This case goes hand in hand with *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144. That decision expanded the "public utility" exemption in the Emergency Price Control Act to include a wide variety of enterprises. The present decision illustrates the value of that preferred treatment.

The Stabilization Act prohibits any "utility" from making "any general increase in its rates or charges which were in effect on September 15, 1942" without giving the President's agent the right to intervene in the proceedings. The present decision goes far towards making that provision ineffective. It allows the Commission so to shape the issues of the rate proceeding as to exclude the data most relevant to a determination of whether any rate increase should be allowed. The power of a commission to shape the issues as it desires and to restrict the Director of Economic Stabilization to those issues is not a power which is apt to be neglected. The Director may of course proclaim against rate increases. But he does not need the right to intervene to prove that rate increases are inflationary. That is self-evident. The right to intervene, if it is not a right to introduce relevant data bearing on the true earnings and returns of the utility, is an empty right indeed.

I agree that Congress did not transfer rate-making powers from the commissions to the Director. I agree that Congress must have contemplated that some rate increases might take place or else it would have treated

the whole problem quite differently. But I find not the slightest indication that the Director was to be denied a full hearing. And I do not see how a full hearing could be accorded unless he was given the opportunity to establish, if he could, that the case under consideration showed no real hardship, that wartime demands were not causing the company to suffer, that its financial integrity and its ability to render service remained unimpaired, that its property was not being confiscated, that it was not being treated unfairly as compared with other companies.

We are told that this company has an inflated rate base of some $1,000,000. We are told that its excessive charges for depreciation expense were over $225,000 a year as compared with the rate increase of about $200,000 a year. . We are told that a full hearing would have disclosed that the company was in fact earning more than 6½%. I do not know what the evidence would show. But an offer of proof in a rate case could not be more relevant.

I believe, moreover, that when Congress halted general rate increases and gave the Director a right to intervene, it did not sanction rate increases regardless of need and regardless of inflationary effect. I think it meant to make utility commissions at least partial participants in the war against inflation and gave them a sector of the front to control. Though it did not remove the established standards for rate-making, I do not think it intended utility commissions to proceed in disregard of the requirements of emergency price control and unmindful of the dangers of general rate increases. To the contrary, I think Congress intended that there should be as great an accommodation as possible between the old standards and the new wartime necessities. The failure of the Commission to make that accommodation is best illustrated perhaps by its treatment of taxes. The Commission allowed the company to deduct as operating expenses all income taxes up to and including 31%. That this amount

includes wartime taxes is evident from the fact that the highest corporate tax rate which prevailed from 1936 to 1939 was 19%. We all know that the extraordinary expenditures incurred for the defense of the nation started with the Revenue Act of 1940. It has been accepted practice to deduct income taxes as well as other taxes from operating expenses in determining rates for public utilities. *Galveston Electric Co.* v. *Galveston*, 258 U. S. 388, 399. But this is war, not business-as-usual. When income taxes are passed on to consumers, the inflationary effect is obvious. And it is self-evident that the ability to pass present wartime income taxes on to others is a remarkable privilege indeed.