NIEDERT MOTOR SERVICE,
INC., Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

LaPorte Transit, Inc., Artim Transportation, Inc., Burren Transfer Company, C. P. T. Freight, Inc., Knox Motor Service, Inc., Landgrebe Motor Transport, Inc., Liberty Trucking Co., Peet Frate Line, Inc., Rudolph Express Co., South Bend Freight Line, Inc., Tucker Freight Lines, Inc., and Welsh Bros. Motor Service, Inc., Intervening Respondents.

No. 77–1566.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1978.
Decided Sept. 18, 1978.

William D. Brejcha, Chicago, Ill., for petitioner.

Robert Lewis Thompson, Dept. of Justice, L. Marie Guillory, Washington, D. C., for respondents.

Before FAIRCHILD, Chief Judge, and SPRECHER and TONE, Circuit Judges.

TONE, Circuit Judge.

Before us is a petition to set aside an order of the Interstate Commerce Commission denying a motor carrier a certificate of public convenience and necessity to carry goods in interstate and foreign commerce. We set aside the order because of errors of law committed by the Commission and remand the case for further proceedings.

*Petitioner's Operations and Application for Authority*

Since 1925 petitioner Niedert Motor Service, Inc. has operated as an intrastate motor carrier serving Illinois and, through interlining with other carriers, northwestern Indiana. Niedert's operations have been conducted pursuant to authority from the State of Illinois and a certificate of registration based thereon issued under § 206(a)(7) of the Interstate Commerce Act, 49 U.S.C. § 306(a)(7). The Illinois authority allowed Niedert to transport

> General freight and household goods within a fifty-mile (50) radius of 1300 Oakwood Avenue, Des Plaines, Illinois, and to transport such property to or from any point outside of such authorized area of operation for a shipper or shippers within such area.

Almost all the freight handled by Niedert has been in less-than-carload (LTL) lots. Almost 60 percent of its total volume has been interlined with other carriers.

In recent years, through efficient use of its large terminal in Des Plaines, Illinois, Niedert has specialized in the consolidation and distribution of small shipments, providing many Chicago area shippers with a complete transportation service for movement of their LTL shipments through the Greater Chicago Area. Niedert would receive from the shipper a quantity of goods in packages consigned to various destinations, break the shipment down according to destination, consolidate the packages with others from different origins consigned to the same destination, and deliver them either to the destination or to an interliner's terminal. Niedert would either set up routings for the various shipments or follow routings prescribed by the shippers. Approximately 1,000,000 pounds of freight moved through the Des Plaines terminal daily. All freight was moved through the terminal and delivered to the consignee or interliner within 24 hours after receipt by Niedert. A handling charge would be paid by the shipper to Niedert for the services performed at the terminal.

In addition, Niedert would move some shipments directly from the shipper's dock to another Illinois destination without going through the Des Plaines terminal. Niedert's fleet at the time the evidence was taken consisted of 90 tractors and 340 trailers.

In the early seventies it became increasingly difficult for Niedert to find other carriers willing to participate in interlined service into northwestern Indiana. Its agreement with one other carrier was cancelled in 1972 when that carrier refused to agree to permit Niedert to recoup its expenses by sharing in the line-haul revenues. During the same year the Commission informed Niedert that its interline arrangement with another carrier was improper. In 1972 and 1973 surveys by Niedert disclosed that no carrier was willing to provide interlined service for the short distance between Chicago and Lake and Porter Counties, Indiana.

In January 1973, Niedert filed the instant application for temporary and permanent authority. The Commission granted temporary authority to serve the two Indiana counties in March 1973.

Niedert's application sought motor common carrier authority to carry general commodities in interstate commerce over irregular routes between

(1) Chicago and ten northern Illinois counties;

(2) points in those counties and other points in Illinois; and

(3) Lake and Porter Counties, Indiana, and points in Illinois.

Because of the request for multistate authority, Niedert was required also to request permission to convert its certificate of registration, which permitted it as an intrastate carrier to handle interstate traffic, into a certificate of public convenience and necessity. See § 206(a)(7) of the Interstate Commerce Act, 49 U.S.C. § 306(a)(7).

### Proceedings Before the Commission

After publication of the application in the Federal Register, protests were received from a number of other carriers alleging conflicting operations. The matter was assigned to a joint board of the Commission, which consisted of a single member. Niedert presented evidence describing its operations, and 17 shippers testified as to their needs for an extension of Niedert's unique, prompt LTL service into the two Indiana counties. Twenty four protesting carriers appeared. Seventeen of the protestants presented evidence against the application, ten of them opposing the Indiana extension and seven the conversion of the Illinois authority. When the sole member of the board, an employee of the State of Illinois, terminated his employment without writing a decision, the Commission assigned the preparation of an initial decision to an administrative law judge, who reviewed the record and issued an initial decision concluding that the grant of authority was warranted in part.

### The Administrative Law Judge's Decision

The administrative law judge granted the proposed extension of authority into the two Indiana counties, based on findings which were accepted on review by Division 1 of the Commission. He found,

the shipper evidence clearly shows that applicant performs an unusual and substantial service within the 50-mile radius, that Lake and Porter Counties are sufficiently part of the Greater Chicago Area, that traffic to such points from producers and from distribution sources in the Chicago Area should be handled like traffic to Illinois points within the radius . . . .

He further found as follows:

1. Because the two involved Indiana counties are a part of the Greater Chicago Area, it is "unreasonable to expect shippers to tender the Indiana traffic to a carrier other than the one handling the Illinois traffic . . . ." 125 M.C.C. at 210.

2. Existing carriers with sufficient authority to serve the two Indiana counties lack facilities similar to Niedert's. The ALJ said,

that few carriers were willing to perform a service similar to applicant's and that

those carriers having authority into Indiana lacked the capacity or facilities for the large volume involved. *Id.*

3. Although it would be possible for Niedert to interline its Indiana-bound traffic, in actual practice existing carriers will not accept that traffic on an interlined basis, duly recompense Niedert for its sorting and sequencing, and "make deliveries without unreasonable delays and circuity." 125 M.C.C. at 211.

The ALJ refused to grant authority for return traffic from the Indiana counties because the evidence was "too scant to support a grant of such authority." With respect to the conversion, the ALJ recommended only a partial conversion of the certificate of registration because the evidence indicated a need only within the northern counties of Illinois.

*Administrative Review*

On review, the three-member Division 1 of the Commission accepted the ALJ's conclusions of fact, as we have noted, but rejected his recommendations and denied the proposed Indiana extension. 125 M.C.C. 209. The Commission acknowledged that the proposed extension would "undoubtedly complement" Niedert's Illinois operations, but said that "undue weight cannot be given this factor." While conceding that "certain aspects of applicant's service which cannot be matched by existing carriers have been quite convenient for shippers," Division 1 said that "such service is largely nontransportation in nature" and therefore would "have no bearing on the issue of public convenience and necessity and must be disregarded in determining whether a need exists for additional transportation service." Finally, the Commission said that actual line-haul transportation service

which Niedert would perform would not be "superior in any material effect" to that which existing carriers could perform.

With respect to the conversion, Division 1 denied relief because it concluded that the evidence failed to show that petitioner was conducting its operations lawfully under the certificate of registration. Whether the certificate authorized Niedert's services depended in turn upon whether those services were authorized by the Illinois authority, so Division 1 recommended that Niedert apply to the Illinois Commerce Commission for "an interpretation as to the scope of the intrastate operations that may be conducted by applicant under its State's Certificate, and whether operations of the type being performed by applicant may lawfully be performed thereunder." Any operations the Illinois commission found to be authorized intrastate could be performed in interstate commerce, and if Niedert was found to be without authority to perform a service needed in interstate commerce, an appropriate application could then be made to the Interstate Commerce Commission. 125 M.C.C. at 221.

*Positions of the Parties in This Court*

Niedert's petition for review of the Commission's order seeks to set aside both the denial of authority into Indiana and denial of the conversion and asks that the proceeding be remanded to the Commission for further consideration. The order is defended by protesting carriers who have intervened and, of course, by the Commission. The Department of Justice, on behalf of the United States, a statutory respondent in all reviews of orders of administrative agencies under 28 U.S.C. § 2344, has filed a brief in which it supports Niedert's position on the Indiana authority issue[1] and argues that

1. The Department of Justice refers to an admission by the Chairman of the Interstate Commerce Commission in a recent report to the President that the Commission has been "overly restrictive" in granting applications for additional motor carrier authority, citing "Report to The President" of July 18, 1977, p. 3, and states that this case "is the story of a man who built a better mousetrap, had the world beat a path to his door, and then had the Interstate Commerce Commission lock the door to keep out the customers." The Department also describes a recent report by a Commission task force as stating that "the scales are heavily loaded" against the new entrant and recommending that there be more competition in motor carrier transportation, citing "Improving Motor Carrier Entry Regulation," July 6, 1977, p. 2.

the Commission failed in its obligation to consider the inherent advantages of the proposed service.

## I.

■ Section 207(a) of the Interstate Commerce Act, 49 U.S.C. § 307(a), provides in pertinent part as follows:

[A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed . . ., and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; . . ..

The Commission based its denial of the Indiana extension upon its conclusion that the existing service was adequate. The only articulated basis for that conclusion was the statement that "the evidence is insufficient to establish that the transit time to any destination by applicant would be superior to the available direct or interlined service." The Commission expressly refused to consider the advantages of Niedert's terminal service on the ground that it was non-transportational in character. We hold that the Commission committed a serious error of law in basing its denial of a certificate merely upon the conclusion that adequate services to meet the shippers' need already exist.

## A.

In determining whether an applicant for motor carrier authority has met its burden of showing that the present or future public convenience and necessity require the proposed operation, the Commission must decide

. . . whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

*Pan-American Bus Lines Operation*, 1 M.C.C. 190, 203 (1936).

■ The adequacy of present service is only one factor to be considered in applying the *Pan-American* criteria. Thus the Commission has said,

Inadequacy of present service is not a prerequisite to a finding that the public convenience and necessity requires a grant of authority. Rather, it is one factor to be considered in arriving at the broader determination of that question. Other elements include the desirability of competition and the desirability of improved service.

*Chickasaw Motor Line Inc.*, 121 M.C.C. 476, 479 (1975) (citing *Nashua Motor Express, Inc. v. United States*, 230 F.Supp. 646 (D.N.H.1964)). The Commission has recognized in other cases that the National Transportation Policy's mandate to promote efficient service, see Part B, *infra*, is advanced by granting additional authority when the applicant is already serving most of the shippers who support the application and the result will be "a service more responsive to shippers' needs than that presently available." *Pirkle Refrigerated Freight Lines, Inc.*, 121 M.C.C. 218, 223 (1975); *LaPorte Transit Co.*, 116 M.C.C. 885, 892 (1974). The Commission departed from these precedents without any explanation in the case at bar.

■ The record and the findings of the ALJ, accepted by the Commission, established that Niedert would have provided a substantially improved service. *See The ALJ's Decision, supra.* Yet the Commission erroneously failed to consider the improvements which Niedert's service would represent. This error stemmed from the Commission's reliance upon a faulty premise. It

held that the sorting and sequencing services performed by Niedert at the Des Plaines terminal were not transportation services. The Commission viewed Niedert's services at the Des Plaines terminal as warehousing. Warehousing, however, involves storing the goods of others for profit. *Security Warehousing Co. v. Hand,* 143 F. 32 (7th Cir. 1906), *aff'd,* 206 U.S. 415, 27 S.Ct. 720, 51 L.Ed. 1117 (1907). The Commission has adopted the definition of a warehouseman set forth in the *Security Warehousing* case, *Holt Motor Express, Inc.,* 113 M.C.C. 478, 481 (1971). Under no rational interpretation of the evidence could Niedert's services at its Des Plaines terminal be viewed as warehousing. The uncontroverted evidence was that within 24 hours after Niedert received goods for transport, it would deliver them either to an interlining carrier or to the ultimate destination. In performing this service Niedert moved 1,000,000 pounds of freight a day through a terminal measuring 24,000 square feet with dock space for 100 trailers at a time. The reason given by shippers in support of Niedert's application was not their need for storage of small shipments but rather their need for the sorting, combining, and routing services and prompt delivery to the interlining carrier or destination within 24 hours.

Even if Niedert's terminal service could be viewed as including temporary storage incidental to movement of the goods, it would nevertheless be a transportation service under the Commission's own prior decisions. In *Propriety of Operating Practices—New York Warehousing,*[2] 198 I.C.C. 134 (1933), the Commission considered whether certain operations in the nature of storage were transportation services. It said:

> While storage of property is clearly within the transportation service which carriers are obligated to furnish, their duty under these provisions extends only to that storage which is necessarily incident to transporting such property. To be incidental business, the storage must be preliminary either to immediate transportation or immediate removal.

198 I.C.C. at 195. This standard was expressly adopted by the Commission for motor carrier operations in *Practices of Motor Carriers of Household Goods,* 17 M.C.C. 467, 494–495 (1939). In that decision the Commission noted that although the statute interpreted in the *New York Warehousing* case, which defines "transportation" as including "storage," 49 U.S.C. § 1(3)a, is not applicable to motor carriers, and the comparable provision relating to motor carriers, 49 U.S.C. § 303(a)(19), did not include the word "storage," nevertheless the "incidental to transportation" test was applicable to motor carriers. The Commission found that the motor carriers involved there were not under an obligation to furnish commercial storage but were obligated to provide intransit storage incidental to transportation. *See also H. Messick, Inc.,* 102 M.C.C. 492 (1966), in which the Commission held that a contract carrier's proposed service allowing its customers to retain possession of the trailer in which goods were delivered for as much as 14 days after delivery was a transportation service even though the trailer would be utilized for storage during that period. The *Messick* decision was approved in *Baggett Transportation Co. v. United States,* 278 F.Supp. 912 (N.D.Ala.1968).

The fact that the carrier services are voluntary does not render them non-transportation services under the Commission's decisions. In *W. S. Hatch Co.,* 108 M.C.C. 853 (1969), protesting carriers argued that an applicant's service of spreading an asphalt sealer on a highway after it had delivered road materials was not a transportation service. The Commission held,

> [t]he fact that protestants have chosen not to perform this spreading service does not prevent it from being a transportation service, for under the act, it is clear that transportation services can include those services which carriers are not le-

---

2. This is the popular name for this case. The official name, as it appears in the caption in the reporter, is: *Practices of Carriers Affecting Operating Revenues or Expenses Part VI, Warehousing and Storage of Property by Carriers at Port of New York, N.Y.*

gally obligated to perform as part of the line-haul movement.

108 M.C.C. at 861. The Commission also said in *Hatch,*

> It is well settled that under the act, the term "transportation" has a broader meaning than the mere carriage of persons, or goods from place to place, since it embraces a variety of connected services as well. See, *e. g.,* section 203(a)(19);
>
> . . ..

108 M.C.C. at 860. Section 203(a)(19), 49 U.S.C. § 303(a)(19), referred to in the *Hatch* decision, provides as follows:

> The "services" and "transportation" to which this chapter [Part II] applies include all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all facilities and property operated or controlled by any such carrier or carriers, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith.

Consistent with this broad statutory definition and with the *Hatch* decision, the Commission held in *Tennessee Transport, Inc.,* 124 M.C.C. 811 (1976), that a carrier's service in reassembling, launching, and water testing house boats after delivery constituted services that were transportation in nature; *see also Martin Trailer Toters, Inc.,* 105 M.C.C. 891 (1967).

The Commission has recognized the integral part played by terminal services, such as those performed by Niedert, in the transportation process, and their importance in improving overall service. Under different circumstances, in *Jerry Lipps, Inc.,* 105 M.C.C. 811 (1967), the Commission recognized the significance of the relationship between line-haul and terminal service in the transportation of small shipments:

> We know from our general experience that shippers of less-than-truckload traffic are adamant in their demands, first that, when ordered, prompt pickup be made by the carrier, preferably at the close of the business day, and also, that their shipments be delivered with celerity. The two somewhat irreconcilable demands of a shipper of say, 800 pounds, can only be met by a routine line-haul schedule provided by the carrier and intimately tied to terminal and pickup and delivery services at both ends, whereby many such shippers' individual traffic (whether or not it is sufficient to support individual vehicle trips) is aggregated for prompt and efficient forwarding.

105 M.C.C. at 820.

The decisions cited in Division 1's opinion in support of its view that the Niedert services were "largely nontransportation in nature" provide no support for that conclusion. In *Kenosha Auto Transport Corp., Extension-Foreign Cars,* 83 M.C.C. 527 (1960), which the Commission does not even bother to cite in its brief in this court, the applicant proposed a storage service at the Port of Baltimore for imported cars awaiting inland shipment at unspecified future dates. In *Griffin Mobile Home Transportation Co.,* 103 M.C.C. 482, 498 (1966), *aff'd sub nom. National Trailer Convoy, Inc. v. United States,* 293 F.Supp. 630 (N.D.Okla. 1968), *aff'd,* 394 U.S. 849, 89 S.Ct. 1631, 23 L.Ed.2d 32 (1969), a service for damaged trailers prior to line-haul movement and another service pursuant to which drivers spent one or two days following the line-haul movements in the assembly of trailers were held to be transportation services. The Commission argues in its brief, not that any holding in *Griffin* supports its order, but that Division 1 applied the criteria stated in *Griffin* when it "decided that the distribution services offered by Niedert did not necessitate final delivery to Indiana points by the carrier." In *Griffin,* the Commission carefully analyzed the proposed services and considered many factors in determining that they were incidental to transportation and therefore entitled to consideration. 103 M.C.C. at 499–501. In sharp contrast, the Commission engaged in virtually no analysis whatsoever in the case at bar. In fact, the Commission ignored the evidence which very clearly showed that the services were incidental to transportation

and indeed largely responsible for the success of the overall service rendered by the applicant. As in *Griffin*, the service proposed by Niedert is performed while the commodities are in the possession of the carrier and is an integral part of the total transportation service. It is noteworthy that in *Griffin* the Commission cited and followed the test stated in *National Bus Traffic Association v. United States*, 249 F.Supp. 869, 873 (N.D.Ill.1965), aff'd, 382 U.S. 369, 86 S.Ct. 538, 15 L.Ed.2d 422 (1966):

> As the court views the word "incidental" it means a minor adjunct to the prime matter, of lesser significance, but related and necessary to the complete effectuation of the matter in chief.

103 M.C.C. at 498. The *Griffin* case underscores the error of the Commission in the case at bar, rather than supporting the Commission's decision.

■ The principle recognized in *Lipps* and the standards established in the other Commission decisions cited above were inexplicably ignored in the case at bar. We cannot believe that the Commission made a conscious and deliberate decision to abandon these apparently sound principles. If it did, then it was required to provide an adequate explanation for its change of policy so this court could properly determine whether its action constituted reasoned decision making. *Hilt Truck Line, Inc. v. United States*, 548 F.2d 214, 216 (7th Cir. 1977); *Papercraft Corp. v. Federal Trade Commission*, 472 F.2d 927, 932 (7th Cir. 1973). As the Supreme Court said in *Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973), there is at least a presumption that an administrative agency's policies "will be carried out best if the settled rule is adhered to. From this presumption flows the agency's duty to explain its departure from prior norms."

## B.

■ The United States has argued a ground differently labeled, yet similar to that discussed in Part A above, *viz.*, that the Commission, in failing to consider the inherent advantages of the proposed service, has not complied with the National Transportation Policy, as interpreted in *Schaffer Transportation Co. v. United States*, 355 U.S. 83, 87–88, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957). The preamble added by Congress in 1940 to the Interstate Commerce Act, 54 Stat. 899, contains a definition of the National Transportation Policy, which provides in pertinent part as follows:

> It is hereby declared to be the national transportation policy of the Congress . . . to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers;
>
> . . . . .

The National Transportation Policy thus declared by Congress "is the yardstick by which the correctness of the Commission's actions will be measured." *Schaffer Transportation Co. v. United States, supra*. The wide discretion possessed by the Commission in determining whether certification of a proposed service is warranted must be exercised in conformity with that policy, *Schaffer* holds. In *Schaffer*, the Commission denied a motor carrier's application for authority to conduct a service that had theretofore been conducted only by rail carriers. The Commission based this decision on the grounds that the rail service was "reasonably adequate" and that the principal benefit of the proposed service would be to provide lower rates rather than improved service and this was not a proper basis for a grant of authority. Referring to the National Transportation Policy declared by Congress, the Court said that "the inherent advantages of the proposed service are a critical factor which the Commission must assess," 355 U.S. at 89–90, 78 S.Ct. at 177, and held that the Commission had erred in failing to consider those inherent advantages, which in that case included the ability to operate with a lower rate, as well as other benefits. We agree with the Department of Justice that the teachings of the *Schaffer Transportation* case are applicable here.

■ The Commission objects to our consideration of the inherent-advantages argument on the ground that the Department of Justice may not raise an issue not presented for review by petitioner Niedert.[3] We need not decide whether the procedural rule relied on applies to the United States as a statutory respondent with an obligation to protect the public interest. At least where the argument of the United States can reasonably be viewed as a variation of petitioner's argument that the Commission was obligated to consider the improvements that Niedert's service would bring, it is appropriate to consider this additional argument. Although cumulative and unnecessary to our decision, we believe it has merit.

### C.

■ The Commission also erred in failing to consider the possible advantages of increased competition, i. e., the possible benefits of allowing another full service LTL carrier to conduct operations in Lake and Porter Counties. This was especially important in view of the ALJ's undisturbed finding that "the few carriers which are willing to perform a similar service to applicant's and which have such Indiana authority do not really have the capacity or facilities for the large volume involved." The failure to consider the desirability of competition is itself enough to require reversal of the Commission's decision and remand for further consideration. *P. C. White Truck Line, Inc. v. ICC,* 179 U.S.App.D.C. 367, 551 F.2d 1326 (1977); *see also Chickasaw Motor Line, Inc., supra,* 121 M.C.C. at 479–480; and *see* note 1, *supra.*

**3.** Citing *Columbia Gas & Electric Corp. v. American Fuel & Power Co.,* 322 U.S. 379, 383, 64 S.Ct. 1068, 88 L.Ed. 1137 (1944); *Vinson v. Washington Gas Light Co.,* 321 U.S. 489, 498, 64 S.Ct. 731, 88 L.Ed. 883 (1944); *Chandler & Price Co. v. Brandtjen & Kluge, Inc.,* 296 U.S. 53, 57–60, 56 S.Ct. 6, 80 L.Ed. 39 (1935).

**4.** Upon remand, the Commission should also consider the terminal service tariff issued to Niedert long after the hearing. In refusing to reopen the record to receive the tariff, the Commission abused its discretion, cf. *Dolcin Corp. v. FTC,* 94 U.S.App.D.C. 247, 219 F.2d 742 (1954), *cert. denied,* 348 U.S. 981, 75 S.Ct.

### D.

■ On remand, the Commission should also consider and explain its evaluation of several other factors. These include whether single-line services would reduce transit times, *Milne Truck Line, Inc.,* 121 M.C.C. 149, 163 (1975), or provide greater fuel efficiency, *Chickasaw Motor Line, Inc., supra,* 121 M.C.C. at 480; *Ace Freight Lines, Inc.,* 124 M.C.C. 799, 802 (1976). Also Niedert's operations into Indiana under the temporary operating authority it had obtained in 1973, although not alone a sufficient basis for the issuance of a permanent authority, should be considered as a relevant factor, *Brown Transport Corp.,* 121 M.C.C. 521, 535 (1975); *Burger Transfer & Storage, Inc.,* 121 M.C.C. 1, 7 (1975), especially in view of the ALJ's finding that Niedert's service into Indiana under the temporary authority "has been quite a help to shippers."

■ The proceeding must be remanded to the Commission with directions to give reconsideration to the portion of the application relating to services into Indiana in conformity with the principles stated in this opinion.[4]

### II.

In support of its application for conversion of its certificate of registration into a certificate of public convenience and necessity, Niedert sought to show past lawful operations under the certificate of registration, which in turn was based upon the Illinois authority.

571, 99 L.Ed. 763 (1955), because the tariff did not exist at the time of the original hearing, and was material and not merely cumulative. Furthermore whether or not it should have affected the result in view of the overwhelming evidence discussed above establishing the transportation character of the terminal service, at least it might have influenced the Commission in the direction of the right result. The fact that the tariff is in existence demonstrates that petitioner is now required to charge motor carrier rates for its services, which affects the Commission's observation that the terminal services were "voluntary" warehouse services.

■ A reason for allowing an applicant to introduce evidence of past lawful operations

> lies in the fact that the State agency, having issued a certificate authorizing motor carrier operations, has already made a determination that a public need for such service exists.

*Richmond Transfer, Inc.,* 124 M.C.C. 840, 844 (1976), citing *Las Vegas Tank Lines, Inc.,* 107 M.C.C. 589, 595 (1968). Even if the past operations are found not to have been lawful, however, they may be the basis for a finding of public convenience and necessity, as the *Richmond Transfer* opinion goes on to point out:

> . . . If, however, such evidence of past operations conducted by the intrastate carrier consists of an abstract of shipments handled unlawfully because they are beyond the scope of the authority issued by the involved State agency, a finding of public convenience and necessity cannot be made without a finding that the involved operations have been conducted under "color of right." In other words, applicant must demonstrate that the past unlawful operations were rendered in a good faith belief that such operations were lawful.

In the case at bar the Commission's reasons for denying the conversion were stated as follows:

> We also find that the public convenience and necessity do not require conversion of applicant's certificate of registration. The evidence of record fails to establish a need for transportation services which cannot be met by existing services, including the service of applicant under its certificate of registration. In the absence of a showing whether operations of the type being performed by applicant may be lawfully performed under the underlying State authority, we cannot determine whether applicant can serve all the supporting shippers under its certificate of registration.

It is not entirely clear from this passage whether the Commission considered all of Niedert's past operations, including those it viewed as having been of doubtful legality, when it determined that existing service was adequate. The Commission went on to state that whether Niedert had exceeded the limitation of service to shippers within the 50-mile area, which in turn depended upon whether Niedert could be viewed as the agent of shippers located outside that area, was a matter for interpretation by the Illinois Commerce Commission. The Commission further said that Niedert's appropriate remedy was to file a petition with the state agency seeking an interpretation as to the scope of its permissible operations. Any operations found to be authorized intrastate could be performed in interstate commerce, and, if Niedert was found to be unauthorized to perform a service needed in interstate commerce, an appropriate application could be made to the Interstate Commerce Commission for the necessary authority.

■ Niedert first argues that the denial of the Indiana extension obviated any need for the Commission to express an opinion on the conversion. We think the Commission properly could rule on the conversion, especially since the application sought an extension of the services being performed under the certificate of registration.

Niedert further argues that the Commission had the duty to determine for itself the extent of the intrastate authority granted by the certificate of registration, that the Commission should have proceeded to make this determination and that in doing so the Commission should have decided that Niedert has been operating lawfully within the limits of the certificate. The protesting carriers asked the Commission to interpret the certificate as not permitting Niedert's handling of freight from shippers outside the 50-mile radius, and they persist in that position in this court.

■ A certificate of registration under 49 U.S.C. § 306(a)(7)(A) allows transportation in interstate commerce only to the same extent as the underlying intrastate authority allows intrastate transportation (except when restrictions included in the intrastate authority are inconsistent with

the requirements of the Interstate Commerce Act). Accordingly, whether operations under a certificate of registration are lawful depends upon whether they are lawful under the underlying intrastate authority. The statute precludes the Commission from ignoring a state restriction which limits a carrier's ability to conduct interlined service in interstate commerce (unless the restriction is otherwise unlawful under the Interstate Commerce Act). *See Overnite Transportation Co.*, 90 M.C.C. 749, 753 (1962). When there is a dispute over whether past operations were authorized by an intrastate authority on which a certificate of registration is based, the Commission does not abuse its discretion in abstaining from interpreting the authority until the issuing state agency has had an opportunity to do so. The refusal to interpret the state authority was consistent with Commission precedent. *Sullivan Transfer & Storage Co. v. Neylon*, 66 M.C.C. 348 (1956); *Orscheln Bros. Truck Lines, Inc. v. Knaus Truck Lines, Inc.*, 108 M.C.C. 301 (1969). The Commission's abstention under these circumstances is consistent with the above-noted reason underlying the treatment of past lawful operations as evidence of public need. If that factor is to be relied on, it is appropriate for the Commission to ascertain exactly what service the state agency intended to authorize. If this can be done by obtaining an interpretation from the state agency, it is manifestly appropriate for the Commission to abstain from its determination of the issues raised by the application for conversion until the state ruling is obtained.

 Although the Commission did not abuse its discretion in abstaining from interpreting the state authority, it did act erroneously when it denied the conversion solely on the basis of the adequacy of existing services. The Commission should have considered whether the past operations, even though they may not have been authorized by the state authority, were nevertheless conducted under color of right and

filled a need. The Commission might well have concluded that the determination of the conversion issue, which depended upon consideration of several factors, should await the interpretation of the state authority by the state agency. When it decided not to postpone its determination of that issue, however, it should have considered whether Niedert's past operations were conducted under color of right and if so it should have weighed those operations in ruling upon the conversion. Upon remand, the Commission may decide to postpone its decision of the conversion issue until a ruling is obtained from the state commission, but whenever it does reach that issue it must consider all relevant factors.

The order of the Interstate Commerce Commission is set aside, and the case is remanded to the Commission for further consideration and determination consistent with this opinion.